Judge Ewing
delivered the Opinion of the Court.
Charles Dobyns and Samuel Bowling having associated themselves together, as partners, for the purpose of driving hogs to Virginia, for sale, and Dobyns having died before his return to Kentucky, his administrators brought this suit in Chancery, for the settlement of the partnership accounts.
They charge, that the whole proceeds of the sales came to the hands of Bowling, except six or seven dollars, left in the hands of Dobyns, and the proceeds of the sale of one hundred and twenty hogs sold by Eli Anderson, which was brought to Kentucky, and paid to a creditor of Dobyns, and that they, with the assistance of a mutual, disinterested, friend, had attempted a settlement with Bowling, after his return to Kentucky, and he, according to his own estimates and showing, was found indebted to the decedent, upwards of sixteen hundred dollars, which he has failed and refused to pay; though he was, and is yet, indebted to a much larger amount.
Bowling answers, setting forth an account of the original capital of each, and an account of the moneys received, &c., but makes no direct response to the foregoing charges made in the bill.
The court decreed sixteen hundred and eighty-two dollars, with interest from the filing of the bill, up to the *435 rendition of the decree, making, in the aggregate, the sum of twenty four hundred and ninety seven dollars and seventy seven cents, and costs, in favor of Dobyns’ representatives, to be levied—first, of the remainder of personal estate, being slaves, left by the will of Bowling’s father, to his mother for life, in remainder to himself and sister, and then, of the real estate devised in the same way. And the heirs and representatives of Bowling—he having died after his answer—have brought the case to this Court.
Objections made to the decree, as grounds for reversing it.
Conclusion from the facts recited, that the compl’ts were entitled to a decree,and that it is not for too much.
Their counsel contend:—
First. That the complainants are not entitled to any decree, and if any, the amount decreed is too much.
Second. That it was not proper to allow interest on the amount.
Third. That Samuel Bowling did not take such a vested interest in the land and slaves devised by the will of his father, as constituted them assets in the hands of his heirs and representatives, for the payment of his debts.
Fourth. If he did, that the slaves, in the possession of his mother, the executrix and tenant for life, under his father’s will, did not constitute present assets in the hands of his administrator, for the payment of Samuel Bowling’s debts.
Fifth. His mother, after judgment of eviction, against Robert Bowling, in his lifetime, having purchased out the adversary claim, is entitled to the absolute estate, and it cannot be subjected to the payment of Samuel Bowling’s debts. We will examine these propositions, in the order in which they are made.
First. We are satisfied, from the most careful examination of the record, that the complainants were entitled to a decree, and that the amount is not too much.
We cannot doubt, that Dobyns paid over to Bowling, before he left Richmond, $3082 92 of the proceeds of the sale of the hogs, which he superintended. W. V. Morris proves this fact unequivocally, as told to him by Bowling, with a detail of circumstances, well calculated to impress conviction of its truth. His evidence is corroborated and sustained by the testimony of Harmon, and McNeal, who substantially prove the same fact. *436 And if any thing farther was necessary, it is rendered conclusive, by the failure of Bowling to respond, otherwise than evasively at least, to the charge in the bill, that all the funds, with the exception of the amounts therein designated, had came to the hands of Bowling.
This fact being taken as true, it will not be difficult to prove, upon any plausible data, that may be assumed, that the amount decreed is not too much.
It is admitted in the answer of Bowling, that Dobyns advanced $3850 334 as capital in the purchase of the hogs, and also, $95 for expenses in starting the droves to market, which added together make $3945 33⅓ cents.
Eli Anderson sold 120 of the smaller hogs at $3,62½ per hundred weight, and made a net profit on the sale, of sixty cents per hog, after paying all expenses. He proves that the larger hogs would, at the same rate, have netted one dollar a head. It is admitted in the answer of Bowling, that he sold the hogs under his control, (which, after deducting the number sold by Anderson, amounted to about 1303,) at from $3,50 to $4,00, per hundred. And the proof establishes, that he sold much the greater number of them at four dollars. The proof also tends to show, that Dobyns sold a portion of those under his control, at $4,75 per hundred. It would therefore be safe to assume that those sold by Bowling and Dobyns, netted one dollar a head, and a sum over which would make those sold by Anderson average also a dollar. There being in all two thousand hogs, the profits upon the whole stock, at this rate, would amount to $2000.
But the whole weight of the hogs, is stated in Bowling’s answer, and also their whole cost. If twenty per cent, be deducted for shrinkage and losses on the road, and two dollars a head be allowed as the average expense for transportation to market, (which is the highest average price proved,) and the sales be estimated at $3,75 per hundred, it will be discovered that the profits will exceed $2000. If the amount stated in Bowling’s answer, as the whole expense, be deducted, instead of estimating the expense at two dollars a head, the amount of profits will still exceed $2000, by the last mode of calculation.
*437 If, therefore, only half the profits be added to the amount of capital advanced by Dobyns, it will make $4945 33½, which he has a right to have refunded. From which, if the $740 paid by Anderson, to Dobyns’ creditor, and the $1000 paid by Bowling to his administrator, and the $323 91 collected by him in Virginia, in money and notes, as well as the sums for which Bowling, in his answer, alleges that he has paid in part, and stands bound in part, as surety for Dobyns, to Wood, King, Wells and Runyan, and the one half of the two protested drafts, be all deducted, there will be left a balance in Dobyns’ favor, of $1911 32½. But if a rateable proportion of the profits, on the two first droves, equal to the proportion which Dobyns’ advances in capital bear to the advances of Bowling, (to which Dobyns’ is entitled, as is alleged in the bill and admitted in the answer,) be allowed to him, and he be also credited with the half of one of the drafts, (which seems not yet to have been paid by Bowling,) and also with the amount of the notes to Wells and Runyan, for which, if Bowling be bound as surety, it does not appear that they yet have been paid by him, the balance due him, will be found not to fall short of the whole sum, in principal and interest, decreed to him by the Circuit Court, and will leave an amount over the decree, if interest was properly allowed, more than sufficient, according to any reasonable estimate, to cover the amount alleged to have been squandered away by Dobyns, in dissipation.
Indeed, the testimony is entirely uncertain and indefinite on this subject. The witnesses all deal in generalities, and so far as any amount is attempted to be specified, the evidence consists mainly in a detail of the swaggering boasts of a drunken man, in relation to his feats of gallantry with women of bad fame, which is entitled to but little weight. And, according to the rate at which we have estimated the sales, the two droves placed under the superintendence of Dobyns, would have produced only $141 78 more than the amount which he paid over to Bowling, which would have been but little, if any, more than would have covered his reasonable travelling and tavern expenses, *438 while engaged in the business of the firm. So that, according to this estimate of profits, if he expended much in dissipation, he must have spent it out of his individual funds. If a greater profit was made, his proportion would be increased to an amount sufficient, perhaps, to cover his alleged wasteful expenditures.
Interest is not, in general, allowed upon the balance found due upon a partnership account: but where the adventure for which a co-partnership was formed, was ended, and a considerable sum to which one of the partners was entitled, remains in the hands of the other, who, tho’ aware of the fact, failed to pay it over till compelled by suit, a decree for a sum equal to the principal and interest, was just and proper.
A devise to the testator’s wife, for life, and after her death, and after the payment of the testator’s debts, and the schooling of his two children, the estate to be divided between them: held, that, by this devise, the two children took a vested remainder—the estate being subject to a charge for the payment of the debts, and for their schooling: the title vested, upon the death of the testator, in the wife for life, remainder in the children—subject to be divested, to the extent of the charges, which might, per possibility, consume the whole.
*438 But the charge in the bill of a balance of upwards of $1600 in favor of Dobyns, (being about the amount of the principal decreed,) produced by the estimates of Bowling himself, and which stands unanswered, leaves no doubt upon the minds of the Court, that the amount of principal decreed by the Circuit Court cannot be too much.
Second. Though, in the general, interest is not allowed on. the balance found due in the settlement of unliquidated accounts between partners, yet, under the circumstances of this case, we cannot doubt that it was equitable and proper to allow it. The partnership had terminated, as well by the death of Dobyns, as the accomplishment of the object of association. The funds were collected and were in the hands of Bowling, and, to the extent of Dobyns’ part, was held for his use. It was, unquestionably, known to Bowling, that a large balance was due him, and acknowledged to be so by his own estimates, as admitted by his answer, or not denied. He withhold^ the payment, and subjects Dobyns’ representatives to a tedious law-suit to recover it, and, in the mean time, enjoys the money and deprives them of the use of it. Its use was worth the interest, and he should, in good conscience, pay it.
Third. Robert Bowling, in June, 1809, made his will, which was admitted to record in December of the same year. By it, he made the following disposition of his estate: “ I give and bequeath to my dearly beloved wife “ Polly, all my estate, during her natural life, (except four “ hundred dollars worth of horses, which it is my will “ and desire that Hanson Price shall have, which I give “ and bequeath unto him.) And after my wife’s death, it “ is my will and desire that my son, Samuel Bowling, “ shall have two mulatto men, named Hanson and Dennis; “ and the balance of the whole of my estate, after all *439 “just debts are paid and schooling my two children, Samuel “ Bowling and Nancy, shall be equally divided between my “ two children, Samuel and Nancy. The following negroes, “ to wit—Cate, Siner, Vine, Tana, Paul, Hanna, “ they and their increase; also, Willoughby, Joe, George, “ Hanson, and John; also, my lands, and all my other “ property that shall be left after my wife’s death. Lastly, “ I constitute my wife Polly my executrix, and require “ that she shall not give security.”
A devise to several, of an estate to be divided among them, makes them tenants in common.
The question is presented on this will, whether the interest passed to Samuel and Nancy Bowling was vested at or before Samuel’s death, and if vested, was the interest of either subject to the payment of their debts.
We think their interest was a vested remainder, subject to a charge upon the estate for the payment of the debts of the testator, and the schooling of his two children, Samuel and Nancy.
That the testator intended the provision for the payment of his debts, and the schooling of his children, as a charge only upon his estate, and not as a distinct interest carved out of it, is evident from the whole tenor of his will, as well as the nature of the charge.
He evidently intended to make a disposition of his whole estate, for life, to his wife, and, in remainder, to his two children, which constituted the whole fee simple in his entire estate. To be divided between my two children, includes not only a devise to them, but also the character of the devise, to wit—a tenancy in common. And, while he vests the title of the whole fee simple estate in his wife and children, he does not carve out of it, or vest a title in any one, for the payment of his debts or schooling of his children. The debts are to be paid and the children schooled, and so much of his estate is to be used as may be necessary to accomplish the object; but the title, in the mean, time passes to the objects of his bounty, subject to be divested, to an extent sufficient to answer that purpose. The persons provided for were his wife and children, to whom, it is evident, he intended his whole estate to pass.
The charge, for the payment of debts, was only such as the law imposed, without any provision in his will; *440 and the charge for schooling was a charge for their benefit, and cannot be construed as having been intended to impose an impediment to their title.
It is said, in Cruise’s Digest, (3d, 220,) “ That it has “ long been settled that a devise to executors for payment “ of debts, and until debts are paid, only gives the “ executors a chattel interest in the lands thus devised, “ and therefore does not prevent the disposal or descent “ of the freehold; so that if, after such a devise, the testator “ gives the same lands to a person for life, the “ freehold will vest in such devisee immediately on the “ death of the testator, and he will be enabled to make “ a good tenant to the precipe.”
“ So, if a testator gives his executor full power to receive “ the mesne profits of his estates, in a particular “ place, upon trust to pay his debts, and afterwards devises “ those estates to a person for life, the freehold will, “ on the death of the devisor, become vested in such devisee “ for life,” &c. Carter vs. Bernadiston, 1 Pr. Williams, 505; 3 Cruise’s Digest, side page 458.
If a man by his will directs his executor to sell his lands, this is but a bare authority, without an interest, for the land, in the mean time, descends to the heir at law, who, until the sale, would, at common law, be entitled to the profits. Bergen vs. Bennett, 1 Caine’s Cases, 16.
In the case of Helm and others against Darby’s Administrator, 3 Dana, 185, Darby directed, in his will, that his whole estate should constitute a fund for the payment of his debts, and then devised it to Mary Brown. This Court determined that his debts constituted a charge upon his estate, that the fee passed to Mary Brown, and, upon her renunciation of the will, descended to his heirs, subject to the charge.
So in the case of Luke vs. Marshall et al., 5 J. J. Marshall’s Reps., 355, Marshall constituted his wife his sole executrix, and authorized her to dispose of any of his property, landed or personal, to pay his debts, and finish a house he had then on hand, and then disposed of the whole of his estate to his wife for life, and at her pleasure to dispose of it among the children of his first wife, as she pleased; and if his then wife had issue, he gave *441 the whole of his estate, after her death, to that issue. It was determined that his wife had a life estate only, with remainder over, subject to a charge for the special objects for which she was authorized to sell.
The meaning of the terms ‘vested remainder’ defined and illustrated.
From all these authorities, it seems clear that, whether a devise is made to an executor, for the payment of debts, or a power to sell for that purpose, or a charge is otherwise imposed on the estate, for that object, or other special objects, that it has been construed as a charge merely, and not as an impediment to the devise or descent of the fee or freehold.
What, then, is the character of the devise in Robert Bowling’s will, when stripped of the circumlocution with which it is enveloped? It is a devise of his whole estate to his wife, for life, in remainder, to his two children; subject to a charge for the payment of his debts, and schooling of his two children.
These charges are not to be construed to obstruct the regular transmission of title to his wife for life, and then to his children.
The title vests in his wife for life, and, after her death, in his children in remainder, subject to be divested, to so great an extent, or for such portions of the property, as may be necessary to discharge the trusts charged upon it. If all be consumed, then the children will never come into the actual possession or pernancy of the profits, yet the title vests in remainder at the death of the decedent—as much as the title for life vests, though there may be a charge upon it sufficient to consume the whole.
Vested remainders are those by which a present interest passes to the party, though to be enjoyed in future, and by which the estate is invariably fixed to a determinate person, after a particular estate is spent. As, if an estate is devised to A for life, remainder to B in tail, with twenty other remainders over in tail to persons in esse, all these remainders are vested.
“ The person entitled to a vested remainder has an “ immediate, fixed right of future enjoyment—that is, an “ estate in presenti—though it only can take effect, in *442 “ possession and pernancy of the profits, at a future “ period.” 1 Cruise’s Digest, 181.
Difference between vested remainders, & contingent remainders.
The same learned author says, “ There is a very material “ difference between that kind of uncertainty which “ renders a remainder contingent, and the uncertainty of “ the remainder’s ever taking effect in possession. For, “ whenever there is a particular estate, the determination “ of which does not depend on any uncertain event, “ and a remainder thereon is absolutely limited to a person “ in esse, and ascertained in that case, notwithstanding “ the nature and duration of the estate limited in remainder “ may be such as that it may not endure beyond “ the particular estate, and may, therefore, never “ take effect and vest in possession, yet it is not a contingent, “ but a vested, remainder.” Ibid, 188.
Again: it is not the uncertainty of ever taking effect in possession, that makes a remainder contingent; for, to that, every remainder for life, or in tail expectant on an estate for life, is liable.
But the present capacity of taking effect in possession, if the possession were to become vacant, and not the certainty that the possession will become vacant before the estate limited in remainder determines, universally distinguishes a vested remainder from one that is contingent.
Thus, says the able author, Fearne—on Contingent Remainders, 329, “ if there be a lease for life to A, remainder to B for life, the remainder to B for life, though it may possibly never take effect in possession, because B may die before A, yet from the very instant of its limitation, it is capable of taking effect in possession, if the possession were to fall by the death of A. It is therefore vested in interest, though perhaps, so vested that it may determine by B’s death before the possession he waits for, may become vacant.”
So in the case under consideration, there are persons in esse to take the possession, to wit. Samuel and Nancy, and the remainder is vested in interest in them, at the death of the testator; they have the capacity to take the possession then, though perhaps the interest so vested, may determine, by the consumption of the whole estate *443 in the satisfaction of the charges upon it, before the possession they wait for, becomes vacant.
In the case of Goodtitle, vs. Whitby, 1 Burrow, 228, a person devised all his estates to trustees, in trust to lay out the rents and profits in the maintenance and education of the two sons of his sister, during their minorities, and then, and as they should respectively attain their ages of twenty one years, to the use and behoof of the said sons of his sister and their heirs.
Lord Mansfield, in the foregoing case, on the authority of Boraston’s case, 3 Reps. 19, laid down the following rules. 1. Whenever the whole property is devised, with a particular interest given out of it, it operates by way of exception out of the absolute property. 2. When the absolute property is given, and a particular interest is given in the mean time, or until the devisee shall come of age, (or as we would say in this case, until the debts are paid, and the devisees educated,) then to him, the rule is, that, that shall not operate as a condition precedent, but as the description of the time when the remainderman is to take in possession. In support of the same principle is the case of Doe vs. Lee, 3 Term Reps. 41.
From all which, it seems that it sometimes happens, that a remainder is limited in words which seem to import a contingency, when a particular interest is excepted out of an absolute devise, when they do not amount to a condition precedent, but only denote the time when the remainder is to vest in possession. And when the adverbs when and then are applied to the termination of the excepted interest, which must of necessity happen, they are demonstrations of the time when the remainders shall take effect in possession, and not when they shall vest. And in like manner, the same effect may be given to the word after used in Bowling’s will in reference to the excepted interest—the payment of his debts and the schooling of his children.
After is intended to designate the time after which the estate will take effect in possession, and not the time when the title in remainder will vest—subject, however, to the additional contingency of the death of the widow, in the mean time, as limited by the previous clauses of the will.
Were it conceded that, in consequence of the terms used in the will—that after the death of the testator’s wife, and after the payment of his debts and the schooling of his son and daughter, the estate should be divided between them, the remainder would not vest until the debts were paid, and the schooling completed: still, the fact that the testator had been dead 20 years, would authorize the presumption that his debts were paid: & the fact that the son had been sometime in business for himself, as a trader, and that the daughter was married, would authorize the conclusion that they had received their schooling; and, by the performance of those conditions, the estate would be changed from a contingent to a vested remainder —a simple devise for life, remainder over in fee, which is always considered as a vested remainder
As a remainder, after an estate for life, was assets in the hands of the heir, at common law, & is liable to be taken and sold under a fi fa. by our statute subjecting lands to the payment of debts, it is, after the death of the remainderman, subject, in the bands of his heirs, to the payment of his debts.
*444 But if there were doubts on this subject, and the payment of the debts and schooling of the children were a condition precedent, or contingency, upon the prior performance of which alone the title could vest in remainder, still, whenever that condition is performed, or contingency has happened, the remainder vests. And in relation to all the estate now in being, it is not shown that it did not take place before the death of Samuel Bowling. And there is every ground for presumption that it had taken place.
About twenty years had elapsed from the death of the testator, before the death of Samuel—a term sufficient to sustain a presumption that all the debts were paid. Samuel Bowling had been engaged as a partner and as an extensive dealer in the purchase and sale of hogs, in a foreign market, and his sister had married. From these facts, it must be presumed, that they had both received all the schooling intended for them. If so, the contingency has taken place, if it be a contingency, upon which, after the death of their mother, and subject to no other impediment, they are entitled to the remainder. By the happening of this contingency, if it be one, the estate is from thenceforth converted from a contingent to a vested remainder.
Freed from this incumbrance upon it, it stands afterwards upon the ordinary ground of a devise for life, remainder over in fee, which has ever been recognized as a vested remainder.
It is said in the case of Ives vs. Legg, 1 Cruise, side page 285, “ that the Court never construes a limitation into an executory devise when it may take effect as a remainder; neither does it construe a remainder to be contingent, where it can be construed to be vested, because the latter tends to support the estate—the former to destroy it, by putting it in the power of a particular tenant to defeat the remainder.” And there is no necessity, in this case, to give such construction to the will.
The estate of Samuel being a vested remainder at or before his death, dependent on an estate for life, as to the realty, was adjudged at common law, to be assets in the hands of his heir. 1 Comyn, 687, title Assets. *445 But if it be doubted whether it were present assets, our statute subjecting lands to the payment of debts, (1 Littell's Laws of Ky. 129,) puts it to rest.
A vested remainder in slaves or personalty—which may be sold, or transmitted by descent or devise—is present assets in the hands of an adm’r.
So, it seems, are remainders in chattel interests in lands.
A trustee, mortgagee, or tenant for life, in possession, cannot purchase & hold any adverse claim to the land, for his own exclusive benefit; such purchase will, in general, inure to the benefit of the whole title—strengthening the title of the cestui que trust &c. as well as that of the purchaser. And altho’, where an adverse claimant recovers a judg’t for the land, the tenant may afterwards take shelter under the successful claim, or purchase it for himself only, without waiting to be actually turned out of possession—the fairness of a purchase, made under such circumstances, will be subject to a rigid scrutiny; & if it appear that it was made with the means of the cestui que trust, mortgagee, reversioner &c. or with the combined means of the tenant for life and remainderman, it will be deemed a purchase for the benefit of the estate, ut supra.
*445 That statute directs that the officer to whom a fieri facias is directed, shall make the same out of, first, the goods and chattels, then of the slaves, and lastly of the lands, tenements and hereditaments in possession, reversion or remainder. Samuel Bowling’s remainder, therefore, in the lands descended to his heirs, if any, is subject, in their hands, to the payment of his debts.
But, fourth: It is contended that his remainder in the slaves and personalty are not present assets in the hands of his administrator.
We think otherwise. It is a legal interest which is vendable and transmissible, by bequest or descent.
It is said that, if a term for years be devised to A for life, then to B, who dies in the life of A, it shall be assets in the hands of B’s executor. 1 Comyn, 692, title Assets.
So it is said on the same page, that if land be granted to A for life, and afterwards to his executor for thirty years, the term shall be assets, though it never could vest in the testator.
So where a lease for years is bequeathed to A for life, and afterwards to B, who dies before A, although B never had this term in him, it shall be assets in the hands of his executor. 2 Williamson Executors, 1013, and the authorities there referred to.
So a remainder in a term for years, though it never vested in the testator’s possession, and though it still continue a remainder, shall be assets in the hands of the executor: “for it bears a present value, and is vendible.” Same authority and page.
Fifth. The only remaining question is, whether the purchase by Mary Bowling, the tenant for life, of the adversary claim, under the circumstances of this case, divested the interest in remainder of her children, as to the land.
It seems that Robert Bowling had purchased about two hundred acres of land from one Goss. That a part of it was recovered by judgment in ejectment, from Robert *446 Bowling, in his lifetime, by an adversary claimant, which was enjoined; and afterwards, by another suit in ejectment against Mary Bowling, a judgment in ejectment was recovered for the residue of the land. That commissioners were appointed to value improvements, and reported their value, in one case, at three hundred and seventy five dollars. That Mary Bowling, before possession was delivered to either of the adversary claimants, and before the improvements were paid for, purchased of one Pogue, one of the adversary claimants, and took a deed to herself, for one hundred and six acres and a fraction of the land, and has lived upon and enjoyed it ever since.
So, tho’ a judg’t for the land had been recovered before the purchase by tenant for life, for herself in fee, as there is ground to presume that she used the judg’t against the pl’tf, for the value of the improvements, and the recourse upon the testator’s vendor, in making the purchase, held, that her purchase did not divest the title of those in remainder. And-
*446 It is certainly true, as a general proposition, that if a trustee, mortgagee, or tenant for life, being in possession, purchases in an outstanding title or incumbrance, he cannot apply it to his own benefit, but it in the general inures to the benefit of him under whom he entered, or is considered as held in trust for the cestui que trust, mortgagor, or him in reversion or remainder. 4 Monroe, 297; 5 Monroe, 435; 2 John. Chy. Reports, Holdridge vs. Gillaspie, 33-4, and the authorities there referred to.
And though, after a recovery in ejectment, and before possession is taken, it might be competent for the mortgagee, trustee or tenant for life, to abandon their claims, and take shelter under the adversary claim, by purchase, without waiting to be ousted by writ, yet they will, in all such cases, be held to a rigid scrutiny and strict accountability. Slight testimony tending to show that they purchased with the means of the mortgagor, cestui que trust, or him in reversion or remainder, or with the combined means of the latter and the tenant for life, will render the claim, so acquired, subject to all the rights and limitations over of the original claim.
And, though a judgment has been recovered in ejectment, and he purchases with his own funds, while he is still in possession, a court of chancery might, perhaps, treat the claim as purchased for their benefit, requiring them to account to him for all reasonable disbursements in its acquisition.
One witness in this case, proves that Mary Bowling *447 paid for the adverse claim, by an assignment of Robert Bowling’s recourse for indemnity upon Goss, his vendor, which is strongly corroborated by other circumstances.
An evasive, shuffling answer to a call, in a bill, upon the tenant for life, who was also ex’x, to show how certain judgments for improvements were disposed of, justifies the conclusion that they were used in the purchase, ut supra.
Mary Bowling being called on, in an amended bill, to exhibit an account of her purchase, and to show what became of the sums allowed for improvements, answers that she received no money for any improvements that were on the land, to the best of her recollection. That she paid Pogue her own money. And that the judgments, for improvements, constituted no part of the pay for the land, so far as she knows or believes.
Now, she was executrix of the estate, and tenant for life, and it was her duty to attend to and collect those judgments, yet she says she received no money for them. If this be true, what became of those judgments? Would she purchase up and pay for the adversary claim out of her own money, when she held a judgment against the successful claimant, her vendor, without taking any notice of those judgments? And would she permit those judgments to lie over for fifteen or twenty years, without collection? If she did not receive any money for them, is it not reasonable to believe, that they were surrendered to Pogue, in part pay for the land—especially as she qualifies the denial, that the judgments constituted no part of the pay for the land, by adding so far as she knows or believes.
Again: she does not show from what resources she raised the money, and it does not appear, nor does she state, that she has any other than those, derived from her husband. Nor does she account for the disposition she has made of the recourse upon Goss.
All these circumstances, taken in connection with her purchase, while she retained possession, and the attitude she occupied, subjecting her, according to the foregoing rule, to a strict scrutiny, bring us to the conclusion, that the title acquired by her, should inure, in remainder, to her two children, according to the limitation in the will.
It is therefore the opinion of this Court, that the judgment of the Circuit Court be affirmed, with costs and damages.