HENRY N. LAMB v. ELIAS A. ROWAN.

1. PARTNERSHIP. *Accounting. Method of stating. Estimates. Credit and debits. Expense account.*

In a suit by one partner against another for a partnership accounting, it is proper:

(a) To decree an accounting to which the complainant is otherwise entitled, although the accounts, by the fault of the defendant, are in such confusion that a perfectly accurate result cannot be reached;

(b) To direct the cost of carrying on the business to be based on the estimates of experts, if there be no other method of estimating the same, considering their estimates along with all of the expenses of the business that can be satisfactorily shown.

(c) To ascertain, as near as can be done, the profit or loss of the business, by comparing the cost of conducting it, so ascertained, with the gross proceeds of the business;

(d) To credit each partner with all money of his shown to have gone into the partnership business;

(e) To charge the business, and not one of the partners, with money borrowed on a firm note and used in the business, money

paid for insurance on firm property and money paid for land purchased by the firm or the partners jointly for use of the firm;

(*f*) To charge notes, the proceeds of which were received by the firm and which were paid by it, to the co-partnership and not to one of the partners;

(*g*) To include in the sum of gross proceeds of sales products sold to one of the partners, or to others on his credit, where such sales were charged to the partner;

(*h*) To credit a partner with the amount of a personal check, with which he paid a partnership debt, and with a partial payment made by him with his individual funds on an outstanding note due by the partnership, the balance on which was paid by the firm;

(*i*) To correct an error by which one partner charged his co-partner with firm money used in the partnership business;

(*j*) To charge the firm with money borrowed by one of the partners on his individual credit which was turned into the partnership and used in the business, the partner having himself paid the lender, and to charge the partnership with interest thereon paid by the partner to the lender;

(*k*) To credit on the partnership expense account money turned over by one of the partners to the receiver;

(*l*) To disallow the expenses of a watchman, items for repairs and other expenses, where such expenses are included in the estimates of the experts upon which, by the fault of the defendant the accounting is necessarily based;

(*m*) To decline to credit one of the partners, as capital contributed by him to the business, with money borrowed by the firm in order to buy machinery to be used in the business;

(*n*) To decline to credit against the gross amount of sales the cost price of property in the hands of the receiver, where the accounts are taken on the theory that the sums paid for partnership property were charged against the gross sales;

(*o*) To decline to charge a partner with money placed in his hands by the firm in order to pay partnership taxes and so used by him.

2. SAME. *Supreme court. Practice. Newly discovered evidence.*

Where the supreme court reverses the decree appealed from and renders a final decree, it will not vacate its final decree and remand the cause for a new trial in the court below on an application therefor based on newly discovered cumulative evidence.

3. SAME.  *Costs of appeal.*

> Where one partner sued another for a partnership accounting
> and the partnership was wrongfully denied by the defendant,
> and, by the fault of defendant in not keeping accounts as he
> obligated himself to do, a large volume of testimony was neces-
> sarily taken touching a great number of items, the supreme
> court will adjudge defendant to pay two-thirds of the cost of
> his appeal, although it reverses the decree appealed from by
> him because of errors in respect to several of said items.

4. SAME.  *Interest on balances.*

> On a partnership accounting no interest should be allowed where,
> even after the evidence was in, it was difficult to state with ac-
> curacy a correct partnership account and there was no point
> during the whole period that could be equitably fixed as the
> time when interest should be charged, as the accounting shifted
> from one set of balances to another, and the first report of the
> master was set aside by the chancellor, and his second report
> was materially modified on both sides of the accounts, and
> finally the balances found by the chancellor were changed by
> the supreme court on appeal, and different balances directed to
> be struck.

5. SAME.  *Discretion of the court.*

> Although, as an exception to the general rule that interest in an
> accounting between partners is not allowed, a court of equity
> may allow interest where, in view of the particular facts of
> the case, it is just and equitable, such allowance or disallowance
> being within the discretion of the court.

6. SAME.  *Statutory damages.   Code 1892, § 4360.   Reversal.*

> A partner cannot be allowed statutory damages on the amount
> found to be due him on a final accounting, where the decree ren-
> dered for him in the chancery court is reversed on the other
> partner's appeal, although a correct final decree be rendered in
> his favor by the supreme court.

FROM the chancery court of Copiah county.

HON. HENRY C. CONN, Chancellor.

Rowan, appellee, was complainant in the court below; Lamb,
appellant, was defendant there.    From a decree in complain-
ant's favor defendant appealed to the supreme court, and com-

plainant prosecuted a cross-appeal.    The facts are fully stated
in the opinion of the court.

For a report of a collateral decision, made in this case, see
*Lamb* v. *Rowan,* 81 Miss., 369.

*Green & Green,* for appellant and cross-appellee.

*R. N. Miller,* for appellee and cross-appellant.

[The briefs of counsel in this case were quite elaborate and
able; they, however, because of the nature of the case, were
almost exclusively devoted to questions of fact, hence no synopsis
of them is given.]

Argued orally by *Marcellus Green,* for appellant, and by
*Robt. N. Miller* and *R. H. Wildberger,* for appellee.

JOHNSTON, Special Judge, delivered the opinion of the court.*
This case is here on Lamb's appeal and Rowan's cross-appeal
from the final decree of the chancery court of Copiah county
settling a partnership accounting between Lamb & Rowan, and
providing for the sale of the partnership property.    On April
3, 1899, E. A. Rowan began the suit in the chancery court of
Copiah county for a partnership accounting and for the sale of
the property belonging to the firm of Lamb & Rowan.    It is
stated in the bill that Rowan and Lamb formed a partnership
in October, 1883, for the purpose of carrying on a sawmill busi-
ness in Copiah county near the town of Beauregard, on the
Illinois Central Railroad, and that they afterwards built another
sawmill and a planing mill near Wesson.    The business was
discontinued in the year 1894, though there was no formal dis-
solution of the partnership.    It is averred in the bill that large
profits were made in the business, which was conducted directly

*Judge Calhoon, having been of counsel in the cause before his
appointment to the bench, recused himself, and Frank Johnston, Esq.,
a member of the supreme court bar, presided in his place.

and indirectly by Lamb, and that on accounting Lamb would owe the firm not less than $20,000, and that the firm would be largely indebted to Rowan. Lamb denied in his answer that there was any partnership between himself and Rowan. Pending this proceeding the partnership property was placed in the hands of a receiver.

On the hearing of the cause the chancellor decreed that there was an equal partnership between Rowan and Lamb, as alleged in the bill, that extended to both sawmills and to the planing mill, and referred the cause to Hon. Robert B. Mayes, as a master, to state an account between each partner and the firm, and also an account showing the gross sales of the lumber and the costs of manufacturing the lumber, and the expenses of the business of the firm. The chancellor also directed the master to state an account of the capital contributed to the partnership by each partner. The chancellor held that certain books of account kept by Lamb were not books of original entry, and were not admissible in evidence, designated as "P 1," and "P 2," and a book called, "Expense Account." An account which had been rendered by Lamb to Rowan after the discontinuance of the business and designated "Rowan account," showing a balance of $10.149.47 against Rowan, was held as admissible as an account rendered to him and not disputed by him. And a book called "Lamb's account" was held to be admissible in evidence as being a statement by Lamb against his interest. The ledgers showing the sales of lumber and four small memorandum books designated as A, B, C and D, were held to be admissible in evidence. Upon these books and upon a great mass of vouchers, receipts, memorandums, letters, notes, drafts, and accounts, and the voluminous testimony of witnesses, filling sixteen volumes that constitute the record in the case, the master proceeded to state the accounts as directed by the decree of the chancellor.

Before proceeding to a review of the exceptions to the master's report a brief statement will be made of this partnership

business.    In 1883 Lamb owned and had been operating near
Beauregard for some years a sawmill which is called in the
record, "Mill No. 1."    This burned in the fall of 1883, and in
October of that year Rowan and Lamb entered into a partner-
ship agreement as equal partners in the sawmill business, and
built near Beauregard, on the line of the Illinois Central Rail-
road, what is designated in the record as "Mill No. 2."    This
mill was completed and put in operation in July, 1884.    They
afterwards built another mill, known as "Mill No. 3," about
four miles from Wesson, and also a planing mill at Wesson.
The machinery of Mill No. 1 went into Mill No. 2, and the
engine and part of the machinery of Mill No. 2 was afterwards
put into the planing mill.    The complainant, in compliance
with an order of court, filed an itemized statement of his claims
against the firm, and subsequently filed a revised statement of
account, bringing in many additional items.    During the
progress of the accounting, Lamb filed an itemized statement of
claims against Rowan, including a large number of items of
indebtedness never charged to Rowan, and not included in an
account rendered to Rowan shortly before this suit was brought.
Lamb managed the mill business and Rowan attended to the
money matters of the firm, raising money on loans, and dis-
counting the firm notes, the proceeds of which he turned over to
Lamb for the business.    Lamb, by agreement, was to keep a
correct set of books for the firm, and this Rowan thought he was
doing.    Rowan kept no books, and relied upon Lamb to keep
the accounts of the firm and of each partner in a proper and cor-
rect manner.    There was no settlement of accounts between the
partners during the entire existence of the partnership.    The
books kept by Lamb are in a great state of confusion, and were
irregularly and not correctly kept, with the exception of the
ledgers in which the account of sales were kept, and these on
their face are self explanatory, and substantially reliable.    It
is impossible to state from these books, or from the voluminous

testimony and papers in the case, an account showing correctly and with a degree of accuracy the capital contributed by the partners to the firm; and it is also impossible to state with accuracy an account between each partner and the firm, nor can an accurate account be stated showing the net profits of the business. The record indicates that the greatest care and thought has been bestowed upon the case by both the master as well as the chancellor, assisted by an expert accountant, Mr. E. M. Cook, as well as the able counsel for the respective parties to the case.

There are no questions of law involved in the case of any difficulty, and the contentions of the parties arise upon a vast number of exceptions to the master's report, which presented for the considerations of the master and the chancellor issues and questions of fact arising out of the testimony. Before reviewing those various exceptions, a second preliminary question presented by counsel for the respective parties will be considered. It is contended by counsel for Lamb that a bill for an accounting cannot be maintained, upon the ground that there was no partnership between Rowan and Lamb; and upon the further ground that, in view of the confusion of the accounts, a correct accounting cannot be had, and that in such case a bill for a partnership accounting should be dismissed. It is also contended that the claims made by Rowan against the firm are barred by the statute of limitations. We concur in the conclusion reached by the chancellor that there was a partnership agreement entered into by the parties in the year 1883, and that it extended to the business of Mill No. 3, as well as the planing mill. While it is true that the accounts of the business are in great confusion, and that a perfectly accurate account cannot be stated between the parties, it is equally true that Lamb is responsible for this condition of things, and we therefore cannot concur with the contentions of counsel that the bill should be dismissed because of the confusion of the accounts of the firm. The master and

chancellor have worked out a conclusion upon all the evidence, and apparently upon the only attainable evidence, that approximates, as near as possible, a correct basis for accounting. Upon a careful review of all the evidence in the case it appears that the basis upon which the accounting proceeded is correct, and that the bill for the accounting was properly sustained by the chancellor.

The statutes of limitations did not run against either partner in respect to any partnership matters, or against any claim that the partner had against the firm, and pertaining to the partnership business.

It is objected by the counsel for Lamb that there could be no accounting between the partners for the reason that the capital contributed by each to the business is not stated and reported by the master as directed by the decree of the chancellor. This was an interlocutory matter, and fully outlines the power of the chancellor where the report of the master came to be heard. The chancellor found in fact that this was an equal partnership, and, while the exact amount invested by each partner is not shown, yet it appears with reasonable certainty in fact that they each contributed to the business in about equal proportions. Lamb was allowed $6.539.25 that went into the construction of Mill No. 2. The account rendered to Rowan showed that in the first years of the partnership the firm was largely indebted to him. Rowan testified that he had put a great deal of money into the partnership, of which he kept no account, and which Lamb never credited him with. Upon this whole question the nearest approach to a conclusion is to accept the findings of the chancellor upon the evidence that the partnership was an equal one, and to treat the partners as they were treated by the chancellor and as they treated each other — as standing upon equal terms in respect to the capital of the firm.

Counsel for Rowan presented the objection that what are known as the "Bennett lands" are incorrectly included in the

partnership lands as directed to be sold by the final decree. When the partnership was formed, Lamb and Rowan each owned lands near the mills. These did not go into the partnership, but were retained as individual property. During the partnership lands were bought by Lamb individually, and the titles taken in his own name, and which did not go into the partnership. Rowan did the same thing. And, again, lands were bought by the firm, and the titles taken in the names of the partners, which were partnership lands., The Bennett lands — about 320 acres — were bought by Rowan, and the titles were taken in his own name. Lamb testified that they are partnership lands, and his counsel places the claim on the theory of a resulting trust. Rowan testified that it was understood between Lamb and himself at the time of the purchase that they were his lands, and the mill was to get the timber. Rowan testified that he had paid nearly all of the purchase money, and closed a balance of almost $360 with a new note and independent security, which he has since paid in part. Lamb does not show that he made any payments on the Bennett land purchases. He did pay with money of the firm $800 to Bennett for timber for the mill, which is allowed by the master on the expense account of the partnership. This is distinct from the land matter. In view of the manner in which the titles to the different lands were taken, as above stated, and in view of the evidence, the conclusion is warranted that the Bennett lands are not partnership lands, and are not properly in the decree. It does not appear that these lands were adjudicated to be partnership lands, but are indicated in the partnership lands directed to be sold.

We concur with the chancellor in his conclusion that no interest was to be charged in the partnership accounting.

It is contended for Rowan that the decree of reference should have directed the master to charge the gross sales of the mills on the firm account, and to require Lamb to have each item of the

expense affirmatively in accounting for the expenditure of the business. This was done in effect. The court directed the master to ascertain the gross amount of the sales, and then to estimate the expense of manufacturing the lumber, and to add such items of expense in conducting the business as were clearly shown, and thus ascertain the profit or loss. In respect to the personal account of the partners, each was to be credited with such amounts as he contributed to the firm, and the chancellor expressly directed that the burden of proof was to be upon each in the establishment of his claims for credits. The master proceeded throughout the accounting upon this basis. He took up the expense account of the firm, and upon the testimony of the mill experts he made an estimate of the mill cost of making the lumber, which is shown by the sales books. To this he added the outside expenses of the business so far as they could be satisfactorily ascertained. He then took up Rowan's account, and charged him with the balance of $10,149.47, shown by the account rendered to Rowan by Lamb, and gave Rowan credit for all items of credit which the evidence showed that he was entitled to. He then took up Lamb's account, and charged him with all the personal items on his account which he is shown to be entitled to, and gave him credit only for such items as were established by the evidence. Everything concerning the title was left to be settled by the proof. The master made a report, which was set aside by the chancellor, and the cause was again referred to the master with more explicit directions, which are entirely correct. In the decree the chancellor directed the following credits, omitted by the master, to be made on Rowan's account:

| | |
|---|---:|
| December 27, 1883. Paid to Deaton............$ | 350 00 |
| May 28, 1884. Beale Loan ...................... | 175 00 |
| Cash ...................... ..................... | 2 00 |
| September 2, 1885. Paid to Lamb................ | 184 00 |
| Lumber used in barn ........................... | 160 00 |
| Paid to Sexton ................................ | 1,119 27 |

---

Opinion of the court.

---

The following aggregate amounts are shown by the master's final report:

| | |
|---|---:|
| Total sales of lumber | $ 181,030 95 |
| Lumber received by the receiver | 707 76 |
| One wagon sold by the receiver | 47 50 |
| Three yoke of oxen and wagon | 230 00 |
| One ox | 7 00 |
| To balance due receiver | 1,368 92 |
| Total | $ 183,392 13 |
| Total amount of expenses | 164,644 28 |
| Net profits | $ 18,747 85 |

Rowan's account, as shown by the master's report, is as follows:

| | |
|---|---:|
| Debit balance as per account rendered | $ 10,149 47 |
| Items not included in the account rendered | 6,209 06 |
| | $ 16,358 53 |
| Credits | 11,456 29 |
| Balance due the firm | $ 4,902 24 |

H. N. Lamb in account with Lamb & Rowan:

| | |
|---|---:|
| Debits | $ 8,685 09 |
| Credits | 6,539 25 |
| Balance due to Lamb & Rowan | $ 2,145 84 |

On the hearing of the exceptions to the report the chancellor made the following correction and changes in the master's report in expense and account:

| | |
|---|---:|
| Total receipts from sales of lumber as reported by the master | $183,392 13 |
| Less items on receiver's account | 2,361 18 |
| | $181,030 95 |
| Total disbursements as per report | $164,644 28 |
| Less items on receiver's account | 2,461 18 |
| | $162,183 10 |

Error in the amount $2,191.40 of un-
collected balance in the report. It
should be $2,919.40...............$    728 00
Attorney's fees allowed .............    130 00
Freights additional on machinery......    115 25
Paid on Griffin timber ...............    558 00
Paid on Wesson lots ..................  1,634 66
Freight allowances on lumber from
sales book O .....................  1,830 44
                                                   166,679 45

Net profits ...................................$ 14,351 50

E. A. Rowan's account, as corrected by the chancellor, stands thus:

Total debits per master's report ................$ 16,358 53
Amount paid by the mill to Griffin ..............      58 00

                                                  $ 16,416 53
Total credits master's report.....................  11,456 29

Amount due to Lamb & Rowan ...............$  4,960 24

H. N. Lamb's account stands as stated by the master:

Balance due to Lamb & Rowan  ...............$  2,145 84

The accounts were placed by the chancellor on the following basis:

E. A. Rowan ½ net profits.........................$  7,175 75
Less balance due Lamb & Rowan...............     4,960 24

                                                  $  2,215 51

H. N. Lamb ½ net profits.........................$  7,175 75
Less balance due Lamb & Rowan...............     2,145 84

                                                  $  5,030 91

In view of the fact that no expense account was kept by Lamb prior to the year 1887, and the further fact that the one that he kept after that time was not correct, or reliable, the chancellor was compelled to adopt, as the basis of the cost of manufacturing the lumber, the testimony of the experts on the subject, and

then to add to their estimate all of the expenses of the business that could be satisfactorily shown, and then from the gross proceeds of the sales of lumber ascertain the profit or loss.    As there was no capital account kept, the only possible basis for ascertaining the interests of the partners was to assume from all evidence that they were equal partners, and that they had contributed an equal amount of capital to the firm business.    Upon this basis the master stated the account.    .

We will now proceed to consider the objections made to the report of the master by the counsel for Rowan.    There is no objection to the charge made against Rowan of the proceeds of seven firm notes discounted in the Merchants' & Planters' Bank, one note discounted at the Capital State Bank for $300, February 20, 1884, and the Ragsdale draft for $250, amounting in the aggregate to the sum of, $4,357.55.    The proceeds of these notes were placed to the credit of Rowan, as shown by the accounts of Rowan with those banks.    Rowan testified that he collected the Ragsdale draft.    The master credited Rowan with all of the moneys that were shown to have gone into the firm business.    This was correct.    Rowan is credited in his account rendered with $150 of the Ragsdale draft collected, and sent to Lamb by Rowan from Jackson February 18, 1884.    The statement of the master on these matters is correct.

It is objected that the proceeds of the firm notes given to Hilliards are charged to Rowan — N. E. Hilliard note, $750, R. E. Hilliard's note $750.    The amounts of these two notes, $1,500, was placed to Rowan's account with the Mississippi Mills.    On November 29, 1883, Rowan gave Lamb a draft of the Mississippi Mills for $800, which was paid to the Lane & Bodley Company on a firm debt for machinery.    On December 12, 1883, Rowan gave a draft of the Mississippi Mills to Lamb for $253, which was paid to the Stearns Manufacturing Company on a debt of the firm for machinery.    And on the same day Rowan gave Lamb $10 in cash, which he got from the Missis-

sippi Mills, which was included in a draft for $400 which was paid to the Stearns Manufacturing Company on a firm debt. These amounts are all credited, as part of the Hilliard loan, to Rowan, by the master.    Rowan paid $704.30 on one of the Hilliard notes with his own funds and the sum is credited to Rowan in the master's report.    All of which is correct.

It is objected that Rowan should not have been charged with the $10,149.47, the balance shown on the account rendered to him by Lamb.    If this had remained a fixed charge against Rowan throughout the accounting, the objection would present the question whether Rowan was bound conclusively by the account rendered.    But this was not the case.    The master took them simply as a starting point in stating the account, and allowed Rowan credit for the items in that account incorrectly charged, and also credits for all items omitted from that account, and charged him with some items not included in that account. This was according to the directions of the decree, and it is correct, and it is the only possible way of stating the account.

Among the exceptions to the report is the objection that $2,000, which he suggests in his brief as the alleged profits on wood sold by Lamb, was not allowed by the master on the receipts of the firm.    The master allowed $723.02 for wood sold to the Illinois Central Railroad Company by the firm.    This is all that is shown by the evidence to have been sold.    We decline to disturb the findings of the master, and which were concurred in by the chancellor.

Counsel for Rowan contends that Lamb on his personal account kept by himself charged himself with $11,272.37 and with $13,983.25, and that these amounts should have been charged to him by the master.    These are not items, but aggregates.    An examination of Lamb's personal account shows that it is full of errors, and that he has charged himself with numerous items that were evidently used by the firm and for the firm business.    Under the general directions of the decree the master

eliminated all the numerous and erroneous charges from Lamb's personal account, and it is perfectly just and equitable that this should have been done. The master, under the same directions, made all the corrections in the items in Rowan's account where, in his judgment, the evidence showed they were errors.

The objections of Rowan in the exhibit to his exceptions to the master's report showing claims to credit will be considered. The claim for an additional credit of $412.89 on the Hilliard notes has been disposed of. Rowan paid $704 on the Hilliard notes which has been credited to him. The Eldridge & Morris item, $282.52. There is no evidence upon which the report of the master can be changed and the decree of the chancellor reversed in respect to this item. Taxes paid by Rowan, $587.65. The master allowed $587.65. The check of $275 to Rowan for taxes was so applied by him. On the expense account $437.09 is allowed for taxes. Paid on Bennett land $501. Rowan is not entitled to any credit for this item, as shown by the evidence. Draft to the Lane & Bodley Company, December 27, 1883, for $100. This was allowed by the master. Money sent to Lamb by express February 1, 1884, $150. This item, we think, should be allowed to Rowan as a credit on his account. This is not the same item as the $150 sent by Rowan to Lamb by express on February 18, 1884, which was Lamb's money. Interest on $300 to Stearns Manufacturing Company, $11. There is nothing in the record upon which to allow this item. The Deaton item of March 30, 1884, $350. This was money paid by Rowan for the firm, and it was allowed by the chancellor on the hearing of the first report of the master, and it is in the master's report. Money by express to Lamb January 16, 1885, $135. Rowan claimed that he sent the money to Lamb, but the evidence that this money was sent to Lamb is conflicting, and we decline to disturb the finding of the master and chancellor on this item.

We have examined the following items:

| | |
|---|---:|
| Miss Lamb, November 16, 1885 ...................... $ 30 00 | |
| Capital State Bank Note, April 17, 1885 ............ 475 00 | |
| Bloom ........................ ...................... 100 00 | |
| Patt..notte ............... ...................... 125 00 | |
| Wimberly ......................................... 110 00 | |
| Goodwin & Bailey ................................. 130 00 | |

There is no satisfactory evidence in the case upon which to disturb the rulings of the chancellor and master on those items.

| | |
|---|---:|
| The Beale loan .....................................$ 175 00 | |
| Cash ............................................... 2 00 | |
| Lamb .............................................. 184 00 | |

The above items of credit were allowed by the chancellor on the hearing of the first report of the master, and they are in the statement of Rowan's account.

The rulings of the chancellor should be sustained in the disallowance of the following items of credit claimed by Rowan:

| | |
|---|---:|
| Mrs. Lamb, in 1885 ..................................$ 30 00 | |
| Lumber in Mississippi Mills in 1886 ................. 119 00 | |
| Note in Merchants' & Plantaers' Bank, in 1886...... 300 00 | |
| Duebill to Bloom ............................ ...... 150 00 | |
| Draft to Woodmen Iron & Hardware Co., 1887...... 20 00 | |
| Daybook charges ................................... 698 83 | |
| Credit to Lamb on Mississippi Mills account........ 34 20 | |

The claim for $583.90 for the interest and discount on eight notes discounted in 1888 we do not think should be disallowed on the evidence, and we concur in the finding of the master and the chancellor. We make the same rulings in regard to the following items: Armstrong note in 1888, $20; H. C. Conn receipt, in 1889, $77; Jesse Parker, in 1889, $28. Rowan is credited by the master with $150 paid to H. C. Conn, attorney for the Lane & Bodley Company, by Rowan. Afterwards $77 was paid, and a receipt in full was given for $227. The evidence does not show that Rowan paid more than $150 credited to him.

The master and the chancellor allowed the following items as credited to Rowan which appear in the exceptions, viz.: Fow-

ler's notes, Stern or Lusk, oxen, $90, Tribbette payment, $335; lumber in barn, $160, and the amount paid to Sexton, $1,119.27. Mr. Miller, Rowan's attorney, contends that more sales of wood should have been charged by the master. We do not concur in this view of the evidence.

The item of lumber sold to the Mississippi Mills of February 6, 1886, $663.01, should be allowed as a credit to Rowan on his personal account. Rowan testified that he had a lot of lumber of his own that came from Bridewell's Mill to the planer of Lamb & Rowan. It was planed and sold by Lamb to the Mississippi Mills for $1,170. Out of this sale $663.01 was placed to Rowan's credit on his account with the Mississippi Mills. On Rowan's account rendered he is charged with $663.01. Lamb's bookkeeper testified that the lumber was sent to the Mississippi Mills from the Lamb & Rowan planing mill, where it had been dressed. This is true. But on the question of ownership of the lumber Rowan's testimony should be accepted. The item of $119.20 for lumber, of May 22, 1886, for which Rowan claims a credit, is not shown in such a manner as to justify the reversal of the finding of the chancellor. The item of $75 credited on the firm note of $1,000 to Douglas should be credited to Rowan on his personal account. This was the price of a lot in Wesson sold by Rowan to Douglas, and indorsed as a credit on the note. There is an apparent discrepancy between the date of the deed and the credit, but this is not controlling in view of Rowan's positive statement that the price of the lot went to the note. The mill paid Douglas $1,000 afterwards, and took up the note with the credit on the note.

It is also objected by Rowan that the master did not make him a sufficient allowance for timber sold by him to the firm. The master allowed for 1,245 acres $867.50. Rowan claimed for 1,250 acres. We cannot make a more accurate estimate of Rowan's timber on the evidence than has been made by the master and concurred in by the chancellor. It is also contended

that Lamb should be charged with the living expenses of himself and family. We cannot concur in this view. Lamb is charged by the master with a total of $8,685.09 on his personal account, nearly all of which is cash, and there is no data in the record upon which the court should set aside the findings of the master and the chancellor in overruling this exception. We concur fully with the chancellor in not sustaining this exception to the master's report.

It is also objected that too large a quantity of lumber was charged to Rowan in his account rendered. There is a conflict of evidence on this matter. Rowan stands charged with the lumber, which appears in his account rendered on the sales books of the firm, and these are unquestionably books of original entry, and apparently are correctly kept. All of the entries of sales of lumber contain the name of the purchaser and the invoice and the price of the lumber, with the date of each sale. We are of the opinion that the finding of the master and the chancellor in respect to this exception should stand. There is no other satisfactory basis upon which to fix the amount of the lumber sold to Rowan.

There is an exception to the amount allowed by the master as personal credits to Lamb that went into the construction of Mill No. 2 from Mill No. 1, which was burned prior to the partnership, and which was the property of Lamb. These amounts are as follows:

```
For. bagging outfit sold to Pattenotte ..............$ 200 00
Lamb's mill pumps, etc.............................  170 00
Fixing mill No. 2..................................  900 00
Grading at mill No. 2..............................  421 00
```

These items are all correctly allowed. The bagging outfit and the oxen were paid for by Pattenotte in the work on Mill No. 2. The sums allowed by the master for the machinery that went from Mill No. 1 to Mill No. 2 are fairly estimated, and the item for grading is correctly estimated. There was a lot of

lumber shipped by the firm to A. W. Jones at Jackson, Tenn. The evidence in respect to this transaction is hazy and conflicting, and there is no satisfactory explanation or data that will justify the reversal of the action of the chancellor of overruling the exception to the item.

Many of the exceptions of Rowan to the master's report are not presented on the brief of counsel, but they are included in his assignment of errors, and are presented by the record for decision, and they have received the careful attention of the court. We have examined the matter of the discounted firm notes which the master charged to Rowan, less the discounts, as accurately as possible, and do not discover any error of the master's report in this respect. Owing to the manner in which the books were kept, the only method was to charge Rowan with the proceeds of the notes received by him, and to credit him back with the moneys paid over by him to Lamb for the business.

There are several general objections presented by counsel for Lamb to the accounting before the master that will be disposed of before proceeding to consider the specific exceptions to items in the report. It is contended that the chancellor erred in directing the cost of manufacturing the lumber to be based on the estimates of the mill experts, and that the actual costs should have been made the basis for the accounting. And the further objection is made that the report of the master does not include the general outside expenses of operating the business. As we have said, there was no other mode of estimating the cost of manufacturing the lumber. There was no expense account kept from 1883 to the year 1887. The account that purports to have been commenced in the year 1887, and which purports to be a book of original and contemporaneous entries, is inaccurate, and not to be relied upon as a safe basis for the time during which it purports to have been kept. The total expense shown by this book is less than $118,000. The evidence shows clearly that it does not contain all of the expenditures of the firm for the

period covered by its dates. The chancellor regarded this as a made-up book, and not one of contemporaneous entries, written up from various loose memoranda, and not to be relied upon as a book in which the entries were made as the transactions occurred. The chancellor held that this book was not competent or admissible evidence as a book of original and contemporaneous entries. Whether it is or is not a book of original and contemporaneous entries, it is too inaccurate to be made the basis of the account of profit and loss. It is not necessary, in the view that we take of the case, to decide the question — which is in reality an abstract one — whether, on the testimony, this book is one of original entries, within the legal meaning of their term, for, if it had been technically before the master, in evidence in the cause, the result reached in the accounting on the basis and theory adopted by the chancellor would have been the same.

Four small-sized memorandum books, designated in the record as A, B, C and D, were kept as books of original entries, but it is impossible to state an account of profit and loss from them, and no effort to do so was made in the court below.

If the book called the "expense account" had been taken as the basis for the expenditures for the purpose of getting the actual cost of manufacturing the lumber, and the same ratio of expenses had been estimated for the years 1884, 1885 and 1886, the total should be much less than the amount allowed by the chancellor for the cost of manufacturing the lumber and for the general expenses of the business. The estimated cost of making the lumber, as allowed by the master, is $5 per thousand for 2,392,815 feet of dressed lumber, making a total of $93,729.21. The difference — $70,915.07 — between this and the total, $164,644.28, in the master's report, is made up of cost of hauling from the mill to the railroad, the cost of machinery, amounts paid for timber, interest and discounts, freights and express charges. This method is fair and just to both

parties, and the work of the master, as shown in stating these accounts from the great mass of confused accounts and vouchers and perplexing entries before, illustrates the patient and painstaking research and accurate discrimination required for a task of this character.

The objections for counsel for Lamb that the report of the master is vague and indefinite, and is not sufficiently itemized, are not well taken. The report of the master is a model of clearness and methodical arrangement; and its itemizations in the exhibits that accompany it is all that could be required to show the items included in its aggregates.

The objection is made to the decree referring the case to the master for an accounting that the master was restricted in the allowance of credits to Lamb to items for which the vouchers were shown. We do not so construe the general directions of the chancellor. A very wide range was taken in the evidence, and the books of account, accounts, letters and correspondence, memoranda and verbal testimony were all before the master and the chancellor, and it is evident that these were made the basis for the master's report. Apparently all the evidence obtainable by each party was introduced in respect to every controverted item in these extensive and complicated accounts.

It is contended that $4,539.13 of accounts collected belonging to Mill No. 1 were contributed to the business of the firm. It is impossible to trace these collections with accuracy. The master allowed Lamb in his personal account for $1,471 of cash that went into construction of Mill No. 2, in addition to the $2,000 logging outfit. Upon the state of accounts in the record the master and the chancellor disallowed this claim, and we approve this finding.

There are a number of objections to various items of the report of the master which will be considered in the order in which they appear in the exceptions in the record, rather than in the order in which they are presented in counsel's brief.

The objections that the items charged to .Lamb are not item-
ized is not well taken, for they appear in an exhibit which
accompanies the report.    The itemization is entirely clear
and particular.    There are a number of items making an
aggregate of $1,105.46, claimed as charges against Rowan.
These items were never charged to Rowan, and are on
the list, filed with Lamb's testimony, containing the omitted
items, which amount to over $20,000.    These matters are
all controverted, and we think that the chancellor's ruling
on the exception should be sustained.    The items of $1,135 cash
claimed against Rowan, and never charged to him, but which
appear on. the list of omitted items, are a controverted matter.
Rowan testified positively that he never received this money
from Lamb.    Lamb's explanation is that he sold a lot of lumber
belonging to Mill No. 1 to the Illinois Central Railroad Com-
pany, and gave it all to Rowan except $6.35, which he kept.    In
this conflict of testimony the master and the chancellor found
against this claim, in which view we concur.    The item of cash,
$480, claimed to have been paid to Rowan from Mill No. 1 is
another controverted matter.    We decline to disturb the ruling
of the master and chancellor on the exception.    There is an
item of $325 credited as cash from Rowan on Rowan's account
rendered to him by Lamb, and on the same day he is charged
with $322 on the salebook C.    It is contended by Lamb that the
entry of the credit is a clerical error.    Book C is not an account
book, which shows accounts, or the account of any other person,
but a mere memorandum book.    The item of $325 never was
charged to Rowan.    The two amounts are not the same, and it
is contended that another entry of $3 was necessary to be
included to make the two entries each $322.    There is no evi-
dence upon which to correct this alleged error and to charge
Rowan with this amount.    These are only the entries them-
selves, and they do not show a patent error.    The two items,
$10.83, January 17, 1887, and $286.96 claimed against Rowan

for lumber, were never charged to Rowan, but appear on the list of omitted items. They are controverted items, and we decline to disturb the ruling of the master and the chancellor. The contention that the amount of the Douglas note for $1,000 should be charged to Rowan cannot be sustained. This money was borrowed from Douglas on the note of the firm, and the money was used in the firm business. It was paid in lumber by the firm, except $75, which Rowan paid as the price of a lot in Wesson. The exception was properly overruled by the chancellor. There was $1,120 of partnership property which was in the receiver's hands included in the master's report. The exception to this was sustained by the chancellor. The claim for an additional allowance for insurance as an item to the extent of $180 is sustained. This was paid by the Mississippi Mills for Lamb & Rowan in 1887, and is shown by an entry on the Mississippi Mills account, "To J. S. Rea, ½ Ins. prem. $180.00." There is nothing to show the payment of the other half of the premium, or what was done about it. This account should be allowed on the firm expense account. The objection that the Hall's safe, valued at $160, was not placed in the expense account, is not well taken, as all of the purchases for the plant are allowed by the master in the expense account under the head of "machinery." The exception that attorney's fees to Weatherford, $75, Dodd & Mayes, 20, R. N. Miller, $20, and R. N. Miller, $25 were not allowed on the expense account is not presented on Mr. Green's brief. The chancellor, on the hearing of the exceptions, added $130 for these attorney's fees. The exact total is $140. We presume that the items are the same, and that the discrepancy is an error in addition or a clerical mistake.

The exception that discounts on loans made by the firm on firm notes discounted were not allowed by the master was not sustained by the chancellor. . The master allowed as credits on

the firm expense account for discounts and interest $2,205.15, as follows:

| | |
|---|---:|
| By interest on notes at M. & P. Bank as per bank statement in evidence ..........................$ | 225.70 |
| By discount contained in the same reference to the evidence ................... ...................... | 424 70 |
| By interest on the Tribbette note ................ | 800 00 |
| Interest on Hilliard note ........................ | 754 00 |
| $ | 2,205 40 |

These allowances cover all the discounted notes. We do not think that this exception should be sustained.

It is contended for Lamb that certain items of traveling expenses, amounting to about $300, should have been allowed on the master's report as expenses of the firm. The evidence does not show clearly or satisfactorily the character of these expenses. The master and the chancellor both found against this claim, and we will not reverse their ruling on the matter. No allowance was made to Rowan for any personal expenses. These matters are in too indefinite a state to be allowed.

The claim for $106, the difference between the cash items paid to Elbridge & Morris for dressing certain lumber specified in the exception and the estimate of $1.70 per thousand for dressing lumber, was properly and consistently allowed. The estimate made by the master of $1.70 per thousand for dressing lumber was applied to the entire amount of dressed lumber made by the firm, and this was over the maximum rate shown by the testimony of the experts. So that, while the estimate of this particular small lot of dressed lumber may be short of the cash amount claimed to have been paid for it, yet the estimated cost of the whole output unquestionably equals, if it does not exceed, the actual entire cost of the whole amount of lumber made by the firm.

The interest allowed by the master on the expense account paid by the firm on the Tribbette note of $3,750 is $800, and not

$840, as stated in Lamb's exceptions. The sum of $531.18 is claimed as an additional credit for interest on this note, and counsel has presented a calculation of interest which contains an error. We give a corrected statement:

| | | |
|---|---:|---:|
| Total payments indorsed on the notes............$ | 4,934 | 93 |
| Principal of the note ......................... | 3,750 | 00 |
| Total interest paid .........................$ | 1,184 | 93 |
| Amount allowed by the master................ | 800 | 00 |
| Difference ...................................$ | 384 | 93 |

This amount, $384.93, will be placed on expense account. The claim for credits for cabins and improvements on the firm property are included in the allowances made by the master for expenditures made on both Mill No. 2 and Mill No. 3. The claim of $800 is allowed by the master for payments made on the Bennett timber on the firm account, which is correct. We think that all of the timber allowances made by the master are correct.

On the evidence as to the item of $200 cash claimed by Lamb to have been given to Rowan to pay for Bennett timber, and that Rowan only paid $150 of it to Bennett, the master and the chancellor both declined to allow the claims, and on the proof it does not appear that they erred.

A part of the credit for $187.50 paid to Griffin for timber is not seriously controverted. Lamb testified that the mill paid $58 in lumber to Griffin. This was not controverted. The master did not allow the amount, but the chancellor allowed it on the hearing of the exceptions. There was a controversy in respect to the balance of this item of $187.50. Lamb testified that he gave Rowan $130 to pay to Griffin for the timber, and this Rowan denied. We decline to disturb the ruling of the chancellor on this exception.

The exception that the master failed to allow $1,634.66 on the expense account paid by the firm to Rowan for lots in Wesson

was sustained by the chancellor, and was placed by him in his final statement of the account, which forms part of the final decree.

Lamb makes a claim for $30 for timber purchased by the firm from Hoggett. The master allowed on the firm expense account $580 for payments made to Hoggett for timber, and we decline to disturb the ruling of the chancellor upon this exception.

The claim for $40 for timber alleged to have been bought from Ben King was not allowed by either the master or the chancellor on the evidence. We decline to reverse their ruling on this exception.

The exception that the master failed to allow on the firm expense account an item of $54.95 paid on a draft of G. W. Carlisle on the firm on January 9, 1890, for land for the partnership, is shown by Carlisle's draft, which is paid. We think that this should have been allowed as a credit to the firm on the expense account, as it was given for Carlisle's interest in land of the firm.

The claim for $5, an alleged error in the amount paid for the Hirsh land, was disallowed by the chancellor, and we see no reason for correcting the amount allowed on the land purchase by the master, which is $150.

Counsel for Lamb contend that a sufficient amount was not allowed for timber cut for Mill No. 2, which belonged to Lamb. We have explored the record in regard to the timber purchased by the firm for both Mill No. 2 and Mill No. 3, and have reached the conclusion that this court cannot state a more correct or satisfactory account of the timber than has been done by the master and the chancellor. The exception that $1,850.67 was not allowed by the master for freight was sustained by the chancellor. On ledger O there is an entry of aggregate losses on lumber, making the total of $1,850.67, the amount allowed by the chancellor. We think the account as it stands is correct.

' It is objected that the sales of wood, amounting in the aggregate to $726.82, are included in the aggregate of the sales of lumber. This is true. Lamb denied that there was any partnership in the sales of the wood, and that this was his individual business. Rowan testified that this belonged to the partnership, and that he often paid off the hands at the woodyard. Upon this conflict in the evidence the master allowed the wood sales, and the chancellor sustained the finding of the master on the hearing of the exceptions, and we decline to reverse the ruling of the chancellor.

The items claimed by Lamb $10 interest on the $100 note to Tribbette, $3 on the note discounted by the Commercial Bank, $1.75 on the Stillwell & Brice debt, and $10.32 on the Brickford & Frazier account, were not allowed by the master, but the court is not furnished with the date that will justify the reversal of the chancellor's rulings on the exceptions.

There is one exception by Lamb that the chancellor omitted to charge Rowan with $46.91 for lumber sold to him by the firm after the account was rendered. The master charged Rowan with lumber after his account was rendered, two items, one of $104.07 and another $4.44. It is not shown that there is an additional item of $46.91.

It is further contended that the master made no allowance for loading the lumber on the cars. It is true that no specific amount was allowed for this item of expense by the master. But the estimate of $5 per thousand made by the master according to the direction of the chancellor in the first decree of reference for rough lumber covers the cost of loading the lumber. The testimony of the experts fix the mill cost of sawing and stacking the lumber on the millyards at $4.75 per thousand and $1.70 for dressing the lumber per thousand. This leaves a large margin for handling as well as for other expenses.

It is further contended that the hauling allowances made by the master are insufficient, in that there was a total of 17,932,285

feet of lumber sawed by both mills, while the hauling expenses are only allowed on 14,334,333 feet, showing a difference between the lumber sawed and the lumber hauled of 3,597,952 feet. This is explained by the fact that the master, in going through the sales books, excluded from the hauling estimate all lumber that was sold and delivered at the mills. Over $25,000 had been allowed for hauling lumber, which is correct.

The exception that no allowance was made for a watchman cannot be sustained for the reason that there are several extra men estimated for by all of the experts who testified in respect to the cost of manufacturing the lumber. This evidently includes watchmen.

The claim for $964.20 for lumber for a shed at Mill No. 3 cannot be sustained. The master allowed $482.10 for this item.

We think the master was correct in allowing $437.09 as the expense account and to Rowan $587.65.

The claim for $160 for a grist mill claimed to have been burned in the planng mill is not sustained by the evidence.

There is an objection that any credits were allowed to Rowan on the revised account that he presented, for the reason that they are not within the decree of reference. We do not concur in the view of counsel. The evidence on both sides extended over every controverted point in the case, and this matter was clearly within the discretionary powers of the chancellor.

There is an exception to the allowance made to Rowan for 1,245 acres of timber cut at $1.50 an acre, amounting to $1,867.50. This matter has already been considered and disposed of.

Counsel for Lamb contend that three of the notes of the firm of Lamb & Rowan which were discounted at the Capital State Bank, one of which was for $300, one for $475, and one for the sum of $100, and two firm notes discounted at the Merchants' & Planters' Bank for $565 and $400, respectively, and three for $300 each, and one note for $53 discounted at the

Commercial Bank, should be charged to Rowan in addition to those charged to him by the master. We have been over all of the notes of the firm which were given for loans, and we approve the finding of the master and the chancellor in respect to the same. The method pursued in the court below was to charge Lamb with the proceeds of the discounted notes where the same were placed to his credit in bank, and to allow him credit for all the amounts turned over by him to Lamb for the firm business. In respect to all of the firm notes for borrowed money, where the notes were not charged to Rowan by the master, the money went at once to the business and the notes were paid by the firm. None of these notes in the exception should have been placed on Rowan's account.

The firm received the entire proceeds of the Tribbette notes —one for $375 and one for $100—and the Douglas note of $1,000, and they were paid by the firm, except $335 paid by Rowan on the Trbbette note and $75 on the Douglas note. These notes were not charged to Rowan, and, we think, properly.

The Rea item of $200, the Grice item of $175, the Cox item of $152.32, the Tillman item of $150, the Stillwell & Brice item of $62.20, and the Campbell item of $114, and an item of $480, which Mr. Green contends should be charged to Rowan, are all controverted matters. They are not charged to Rowan on his account rendered by Lamb, and there is no satisfactory evidence upon which to charge the items to Rowan.

The note of $500 to White, which it is contended should be charged to Rowan, was paid by Rowan with his own money, and he testified that the proceeds of this note went to the firm. This credit was proper, and the note should not be charged to him.

The item of $357.79 for lumber claimed by Lamb against Rowan was not charged to Rowan by Lamb. It is a controverted matter, and there is no satisfactory evidence upon which to charge it to Rowan.

None of the items of exceptions in volume 1, p. 116, several

of which have already been disposed of, should be sustained, except the $300 the proceeds of the Ragsdale draft, that went to the Lane & Bodley Company on December 27, 1883, on a firm debt for machinery. This should be allowed to Lamb on his personal account. These items have all been fully examined. The $800 and $100 of the $400 paid to the Lane & Bodley Company in December, 1883, and the $253 paid to the Stearns Manufacturing Company were part of the proceeds of two notes given to the Hilliards for $750 each for loaned money. The $1,500 was credited to Rowan on his account with the Missssippi Mills, and the master charged him with the $1,500 and credited him with the $800 and $100 of the $400 paid to the Lamb & Bodley Company and $253 paid to the Stearns Manufacturing Company. This is a correct statement of the transaction.

The other thirteen items in this exception, volume 1, p. 116, 117, of the record, have been examined, and we decline to disturb the findings of the master and the chancellor in allowing the claims. The item of the Ragsdale draft, $250, is clearly explained. This draft was handed to Rowan by Lamb in January, 1884. Rowan collected it, and in February, 1884, sent $150 by express to Lamb, which is credited to Rowan on his account. The master charged Rowan with the amount of draft, which is correct.

The decree for a credit of $50 on the firm expense account for a Cove saw swage, which is credited on an account of the firm with Baldwin, Rhodes & Co., for a new saw swage for $75 on November 22, 1889, should have been allowed.

It is contended that an aggregate of $1,949.69, made up of amounts paid for machinery in 1883 and 1884, beginning with $800 paid to the Lane & Bodley Company and the $253 to the Stearns Manufacturing Company, which has already been examined, should be allowed as so much capital contributed by Lamb to the firm, which were not so held by the master or the

chancellor. We concur with the master and the chancellor in the disallowance of the claim, as the greater part, if not all, this sum was paid with money borrowed by the firm. None of the items composing this aggregate are shown to have been paid by Lamb.

There is an elaborate schedule filed with Lamb's exceptions showing entries of cash that were charged to Lamb on his own account, taken from his personal account, that were used in the business of the firm. We have examined Lamb's personal account as stated by the master, and find that he is not charged with the money of the firm that he received personally and for his own use, and that the master has estimated from Lamb's account which he produced in court all of the items of cash that should have gone in a partnership account and cash account if the books of the firm had been correctly kept.

. The decree of December 17, 1901, directed the master to credit Rowan with $160.36, lumber used in a barn, and $1,-119.27, paid by Rowan to Sexton, and also to credit the expense account of the firm with these items. The master credited them to Rowan, but did not place them on the firm expense account. On the hearing of the exceptions this action of the master was confirmed by the chancellor. Rowan is entitled to these credits on his account with the firm, and we think that they were properly omitted from the expense account.

The objection that the cost price of the property in the hands of the receiver should be credited against the gross amount of the sales of $181,030.95 is not well taken, for the theory upon which these accounts proceeded is that the amounts paid for the partnership property were charged against the gross sales of lumber. The master allowed on the expense account for machinery alone the sum of $21,254.43, besides allowing the price of the partnership lands and of timber purchased for the mills. We think that this is correct.

We find a renewal of the objection by Lamb that the expense

account does not include an allowance for repairs and various other items of expense contained in Exhibit 2 to his exceptions. This is true, but we have seen that on the estimated expense account the estimate of $5 for rough and $6.70 for dressed lumber allowed a large and liberal margin for incidental expenses not included in the master's itemization of actual expenses. The master allowed all of the larger actual expenses of the business, such as insurance, taxes, freight and express charges, timber purchases and hauling, and these supplemented the estimated mill cost of making the lumber. To have superadded to these the incidental items of expense claimed by Lamb would manifestly show an incorrect balance. If the estimate method is abandoned, and only the items of actual expense proven by the evidence to have been paid out allowed, there is no doubt whatever, from the evidence in the case, a very large and fictitious balance of profit would appear. It is apparent, therefore, from the condition of the affairs of the partnership, that the chancellor adopted the only practicable, if not the only possible, method of stating the account.

It is contended that the lumber sold to Rowan, and the lumber sold to other persons and charged to Rowan in the account rendered to him, should not have been included in the gross amount of the sales of lumber fixed by the master. It is true that this lumber is included in the total gross amount of sales of lumber fixed by the master. This constituted sales of lumber by the firm to Rowan, and it is all charged to him as such on his account rendered, which is all correct.

The items of the years 1887 and 1888 in volume 1, p. 125, of the record, making an aggregate of $749.91, claimed by Lamb against Rowan, appear in the Mississippi Mills account kept in Lamb's name as cash paid to Rowan and charged to Lamb. They were not charged to Rowan on his account with Lamb & Rowan. It is argued by counsel that these items should now be charged to Rowan for the reason that they appear, as

stated, on the Mississippi Mills account. We do not concur in this view of counsel. The account in Lamb's name with the Mississippi Mills was a firm account of Lamb & Rowan. An account was afterwards opened with Lamb & Rowan by the Mississippi Mills.

It is objected also that there are six items credited on Rowan's account with the Mississippi Mills from Lamb & Rowan which should now be charged to Rowan. They are as follows: In 1887, Rea lumber bill, $200, to E. A. Rowan, $63. In 1889, Oliver & Sons, $30. In 1895, balance transferred to Rowan, $60.95. In 1888, amount charged to H. N. Lamb, $269.50 and amount charged to Rowan, $5.53. These items, with $747.91, make the aggregate of $1,105.46 which is the subject of an exception that has already been disposed of. None of these items were charged by Lamb to Rowan. They are all controverted. We are not able to say what are the actual facts relating to these entries, and we will not disturb the findings of the master and chancellor on these exceptions. The two items making $357.79 for lumber in 1887, claimed by Lamb for lumber sold to Rowan and never charged to Rowan, are included in the list of omitted items, which amount in the aggregate to over $20,000, are controverted, and we will not change the account in this respect.

Lamb claims a credit for $74 as interest paid on the White note of $500. This entire note was paid by Rowan, and the master credited Rowan correctly with the principal and interest $574.

The master and chancellor declined to allow a credit on the expense account for a gristmill, $160, which is alleged to have been burned in the planing mill. It is said to have been purchased from H. Dudley Coleman, but there is no bill or invoice of it, and there is no evidence in support of it upon which the finding of the master and the chancellor should be overruled.

It is objected to the item of freight on machinery, $1,343.10, in the expense account of the master, that the vouchers show

$1,458.33, and it is said in the exception that the chancellor examined these vouchers on the hearing of the exceptions to the first report of the master.   But the chancellor, with the vouchers before him, declined to sustain this exception.

After filing his first account in the cause, Rowan filed a revised or amendment account.   There is an exception to every item on that revised account which was allowed by the master on the ground that it was not included in the decree of reference, and on the further ground that the account rendered to Rowan is an account stated, and, according to the decree of reference, is conclusive.   It is further objected that these items are barred by the statute of limitations.   We do not think that this is a correct construction of the decree.   The master was instructed to eliminate from all of the accounts all errors that were satisfactorily shown by the evidence to be such.   Even if the decree, in its terms, had not included all of the accounts filed by Rowan, it is evident that everything was gone into by the evidence, and the matter was, as we have already said, within the control of the chancellor.   We have already disposed of the question of the statute of limitations.

Lamb objects that Rowan was allowed $1,867.50 for the timber cut on 1,245 acres of his land.   We have already expressed the view that none of the findings of the master and chancellor in respect to the timber allowances should be disturbed.

Lamb has filed exceptions to almost every one of the credits allowed on Rowan's accounts by the master and the chancellor. We will note briefly each one of the exceptions.

The evidence is clear that Rowan paid $704 of his own funds on the Hilliard notes.   It is equally clear that $800 and $100 of the money borrowed on the Hilliard notes went to the Lane & Bodley Company, and that from the same source the $253 to the Stearns Manufacturing Company was paid.   The evidence shows clearly that Rowan paid with his individual funds a firm note in 1884 to the Stearns Manufacturing Com-

pany, $253.50. Rowan was credited by Lamb on his account with $253.50. This entry was afterwards changed on Rowan's account by having $153.50 written in its place. The original entry was correct, and should have stood. The master credited Rowan properly with $100 on his account, which corrected the error.

The sum of $952 of Rowan's money in the Capital State Bank was paid on two notes discounted at the Merchants' & Planters' Bank—one for $550, of March 21, 1884, and one for $400, of April 10, 1884. There is no doubt about this fact on the evidence, and we concur with the master and chancellor in their rulings on this exception.

The item of $23.61 credited to Rowan by the master is the difference between the amount charged to Rowan on his Missssppi Mills account and the amount in the statement of this account. This was an error which is apparent, and it was corrected by the master by giving Rowan credit for the $23.61.

On January 15, 1886, Rowan gave his personal check on the Merchants' & Planters' Bank for $65 to pay a firm debt to Bartlett, and which was applied to the debt. This amount was properly credited by the master to Rowan on his account.

There is an exception to the allowance by the master of $110 sent by express by Rowan from Jackson to Lamb on January 21, 1886, for the firm business. We think that the evidence warranted the master and the chancellor in allowing this credit on Rowan's account.

The next objection is to ten small items that are set out in the exceptions, running from $2.75 to $37.50, as cash paid for the firm by Rowan, and which were allowed on credit to Rowan by the master and the chancellor, and which allowances, on the evidence, we sustain.

As to the $129, and the item of $120 paid for oxen by Rowan for the business, there is no doubt, upon the evidence, of the correctness of the allowance of the amounts as credited to Rowan. It is equally clear that Rowan paid to H. C. Conn $150 on

account of a firm note to the Lane & Bodley Company on February 3, 1889.

Rowan claimed a credit for $777 paid by him to Williams Bros. on firm orders for mill hands given on Williams Bros. They went through this account and picked out all these small orders from the other items which appear on the Williams Bros. account, and upon this allowed Rowan credit for an aggregate of these orders of $561.84, which is correct.

The evidence is entirely satisfactory that Rowan paid $335 on the note of the firm to Tribbette. This note was given originally to the Capital State Bank for a loan for Lamb & Rowan. It was bought by Tribbette, and he extended the note, when finally it was taken up by the firm. We approve of the allowance of this credit to Rowan of the partial payment made by him on this note.

The master allowed Rowan a credit for $690, which was paid by him on a firm note for $900, discounted in the year 1887 in the Merchants' & Planters' Bank. This is correct on the evidence.

The order of Rowan to Pattenotte on Riley for $60 for work done on the mill was correctly allowed as a credit to Rowan.

We think that there is no doubt that Rowan closed the balance of the firm account with Williams Bros. with his note for $265.16, and this was allowed by the master on his account.

The items of $5.30 for costs in the Hartgog suit and $2 cash paid for work on the mill were correctly allowed as credits to Rowan. They are clearly established by the evidence.

The item of $100 of December 27, 1883, "Draft Miss. Mills $100," to which an exception is filed on the contention that it should not be allowed as a credit, has already been carefully examined, and our concurrence expressed in the finding of the master and the chancellor as to the merits of this claimed credit.

In respect to the second objection to this item—that it appears twice as a credit on the master's report—we have made a careful investigation of the testimony in order to ascertain

whether the items are the same. On December 27, 1883, Rowan gave Lamb a draft or bill of exchange for $100 drawn by the Mississippi Mills, which was sent to the Lane & Bodley Company with $300 of his own, making the credit of $400 that appears on the Lane & Bodley Company's account. Rowan on that day had no other transaction of $100, but he testified that his recollection was that he checked $200 out of the Mississipp Mills on that day, which he gave to Lamb to pay the mill hands. This Lamb controverted, and the $200 claim is disallowed by the master and chancellor. We have already sustained their ruling on the $200 item. We find that the $100 appears twice on the master's report, the result, evidently, of a clerical error, and it will be corrected.

We have examined the following allowances of credit by the master to Rowan, and find them correct, viz.: Stern for oxen in 1887, $90; the note to White and interest, $574, in 1888; the Commercial Bank note of $153 in 1892; paid Deaton $350 in 1884; Beale loan in 1884, $175; and to Lamb $184 on September 2, 1885.

The item of $160 for lumber used in building Lamb's barn was allowed by the chancellor in the second decree referring the cause back to the master, and we think this was entirely correct on the facts. The barn was built for the convenience of the firm, and was used for the mill. It was built on Lamb's land, and is Lamb's property. The lumber belonged to the firm. Lamb erroneously charged Rowan with the whole amount. Rowan did not owe for the lumber, for it was firm lumber used for the partnership business. It was the proper way of correcting Lamb's error to credit Rowan with this amount, as was done by the master and chancellor.

Lamb has an exception to the allowance by the chancellor in the second decree of reference of $1,119.36 paid by Rowan to Sexton. The facts in respect to this item are as follows: Rowan gave his personal note to Sexton for $1,369.36, of which $480

went to Rowan for his own use, and the balance was given by Rowan to Lamb to pay some freight bills due by the firm. Rowan's statement in his testimony on the point is quite clear and positive. He explained fully how much money the mill received, and he also explaned the details of the business transaction between himself and Sexton in respect to the $480. In the year 1893 the mill paid $1,848.96 in lumber on this note and its accumulated interest, which was all charged to Rowan on his account, and so stands on his account rendered. The balance of the note—about $800—was closed by Rowan by a new note of his own. The original note to Sexton bore interest at the rate of 15 per cent per annum, which accounts for the large amount paid on it. The master made an apportionment of this transaction by charging the firm in Rowan's favor with the money that Rowan turned over to the firm, and which was used by the firm, with legal interest, which is correct, as Rowan in effect loaned this money to the firm, having paid off the Sexton note. It is conceded in Lamb's testimony that the firm received some of this money from Rowan to the extent of $200 or $300, though he testified positively that the mill got all but the $480. We think it clear that Rowan is entitled to the credit of the money that went to the firm, with legal interest, and upon this basis the master allowed the credit to Rowan of $1,119.27.

There is a long list of items in the record, volume 1, pp. 137, 138, which Lamb insists should be charged to Rowan. They are items that were never charged to Rowan by Lamb. Among them are the various notes of the firm which were discounted, and where the proceeds went to the business of the firm, and none of which should be charged to Rowan. All of these items have been passed on in the opinion, except a check for $275, given to Rowan for the payment of the taxes of the firm. This money was paid by Rowan for the firm's taxes. If he had been charged with this sum he would have been entitled to a credit for it, so there is no reason for putting it on the statement of the account.

The items in volume 1, p. 139, of the record, making an aggregate of $2,012.84, have been already considered and passed upon. Some of them have been considered on the exceptions that they should not have been credited to Rowan. It is perfectly clear on the evidence that the $800 and the $100 of the $400 paid to the Lane & Bodley Company and the $253 paid to the Stearns Manufacturing Company, included in these exceptions, came from the Hilliard loan of $1,500, and were not paid by Lamb with his individual funds. There is nothing in the evidence to authorize us to set aside the findings of the master and the chancellor in not allowing Lamb credit on his personal account of the other items named in the exceptions, viz.: Quinine, $9.85; freight on machinery, $80; to Margan, $10.60; Capital State Bank note, $247.85, of May 8, 1884; cash erroneously credited to Rowan by Lamb, $63.15; cash to Pattenotte, $10; freight on machinery, $0.50; cash to Rowan, $20; express on belt, $18.70; freight, $18.70; freight, $2; cash to Rowan from Hicks, $53.19.

We have examined the list of items in volume 1, pp. 142, 143, 144, claimed as expenditures or expense items, which should, it is insisted, have been allowed by the master. These are for various small articles for the mills, some for ordinary operating expenses, items for machinery, for work in constructing mills and ordinary repairs, for hauling, and an estimate of $2,000 for construction work and hauling machinery. As we have already observed, the master has allowed for—

| | |
|---|---:|
| Machinery | $ 21,254 43 |
| And freight on machinery | 1,343 10 |
| Hauling machinery and construction | 3,500 00 |
| Lumber and boards | 574 60 |
| | $ 26,672 13 |
| To this is added the total allowed on Lamb's account for construction work | 5,171 00 |
| Total | $ 31,843 13 |

In addition, as we have already stated, there was a credit made by the master of $5 for the cost of rough and $6.70 for dressed lumber, which left a large margin for outside operating expenses, wear and tear, and ordinary repairs. As we have said, the only possible method or basis for this accounting was the one adopted by the chancellor, and any effort to state an expense account based on the books kept by Lamb would have made the total cost of producing the lumber and operating the business so much less than what we know must have been its actual cost and the actual expenses as to demonstrate the incorrectness of that method. As an illustration of this, each of the experts estimate at from two to four extra men on the rolls at not less than $1 per day, which would provide for a watchman. Lamb, in his exceptions, estimates a watchman for the mill and for the planer at $4,425. It is not suggested that the expense account of the firm as kept by Lamb showed this aggregate for a watchman. In fact, that account does not show over $1,600 as paid for a watchman during the period of that account from 1887 to the close of the business. Thus it is evident that the only possible method of stating the account was the one adopted by the chancellor.

Accompanying Lamb's exceptons to the master's report is an exhibit which contains a tabulated statement of the amount each item allowed by the master on the machinery account and the amount which Lamb insists is shown by the vouchers. This involves the purchase by the firm from 35 dealers in machinery. The vouchers for these purchases are voluminous and complicated, and fill nine large packages. Many of them are in a state of great confusion. They consist of statement of account, express money receipts, draft notes, letters of acknowledgment, and correspondence. Many items for which credits are claimed appear several times on vouchers. Thus the same item for a payment is shown by an express receipt for money sent to the creditor, and again as a partial payment on account by a letter

of acknowledgment, and finally by an account paid in full with the partial payments credited. These exceptions extend to the greater part of purchases of the $23,266.05 for machinery allowed by the master on his statement of the firm expense account. The master has filed with his report an exhibit containing an itemized statement of the amount allowed on each of the accounts of the firm of Lamb & Rowan with the different dealers, which shows the aggregate amount stated in the body of the report. We have examined particularly all of those vouchers which are involved in these exceptions, and find that in some of the accounts either freight or express charges have been added to the amount of the bill or invoice for the machinery, which was deducted by the master, and placed on the itemized statement of freight and express charges, which are allowed in the express account, and which is marked "Exhibit No. 6" to the master's report. We find that the itemized statement of allowances for machinery purchases as made by the master is correct, except the aggregate of purchases from the Lane & Bodley Company allowed by the master, $6,102.67, should be $6,388.95, making a difference of $286.28, which is claimed in the exception, and which should be added to the total expense account as settled by the chancellor.

There was $100 cash turned over to the receiver by Lamb, which should be credited on the firm expense account, and there is an item of $100 paid to Dun's Agency by the firm, which is not controverted, and which, by omission, must have escaped the attention of the master and the chancellor. This will be placed on the expense account as a credit against the gross amount of the sales.

We have examined each question presented by counsel for the respective parties, as well as each controverted item in these complicated and extensive partnership accounts, and we are satisfied that the conclusions announced are as correct and accu-

rate as can be reached in view of the confusions of the accounts and the conflicts in the testimony in the cause.

We have alluded in this opinion to the findings of the master and the chancellor on the exception to the master's report, since by the agreement of the counsel the master presided with the chancellor on the hearing of the exceptions.

The decree of the chancellor is reversed, and a final decree will be rendered in this court according to the directions indicated in this opinion. We have prepared a statement showing the state of the accounts after making these changes. The costs of these appeals will be apportioned between the parties; one-third against Rowan and two-thirds against Lamb.

### ON SUGGESTIONS OF ERROR.

_Green & Green_ and _Mayes & Longstreet,_ for appellant, filed a suggestion of error.

_R. N. Miller,_ for appellee, also filed a suggestion of error, making the following points:

The record shows that Rowan made every effort to settle the matter between himself and Lamb without suit, and Lamb denied his interest in the partnership, and refused all overtures for a settlement; that all the lumber sold by the firm or for the firm was sold prior to 1894; that Rowan, even after the suit was brought, tried in every way to adjust and settle the trouble, but Lamb refused to settle it. It is perfectly plain that Lamb owed Rowan the amount finally found due him, and has persistently withheld it, and Rowan was forced to sue. I suggest, then, that in due respect for justice and equity this court either ought to give Rowan interest at legal rates on this sum finally found due him by Lamb, or Lamb ought to be taxed with all the costs in the courts in this case, which is in the court's discretion. _Gyger's Appeal,_ 62 Pa., 80, 1 Am. Rep., 382; _Bowling's Heirs_ v. _Dobyns' Heirs,_ 5 Dana 438; _Munford_ v. _Murray,_ 6 Johns. Ch., 4; _Taylor_ v. _Young's Adm'rs,_ 2 Bush, 432; _Stoughton_ v. _Lynch,_ 2 Johns. Ch., 209.

JOHNSTON, Special Judge, delivered the opinion in response to the suggestions of error.

We have carefully reviewed the former decision and opinion rendered in this case on all of the propositions submtted in the suggestion of error which has been presented by the learned counsel for H. N. Lamb. The question of the existence of the partnership between Lamb & Rowan is one issue in the cause, upon which the most voluminous testimony was taken. It is the principal issue in the case, and, while there is some conflict on the point, the fact of the partnership is proved by the great weight and preponderance of the evidence. We therefore adhere to the conclusion reached on the question in the former decision of the court. We also adhere to the former ruling that the partnership was an equal one, and that this was the correct basis of the accounting.

In the suggestion of error it is insisted that $1,135, the proceeds of lumber sold to the I. C. R. R. Company in January, 1887, and alleged by Lamb to have been paid over to Rowan, should have been charged in the accounting before the master to Rowan. That is a controverted item in the accounting, and we examined fully all of the evidence on the point, reaching the same conclusion that was reached by the master and the chancellor. This item was never charged on the books kept by Lamb against Rowan, and appeared in the cause for the first time in a list filed by Lamb purporting to contain debit items against Rowan, which had been accidentally omitted from the books. We think that this item was properly excluded from the accounting by the master and the chancellor, and we adhere to our former ruling on this point.

We think that the $500 note to White in 1884 was a firm transaction, and that the proceeds of the note went to the firm. The argument made on this point by the learned counsel is based on certain items on account between Rowan and the Mississippi Mills, which do not outweigh Rowan's positive testimony that

the firm got in the proceeds of this note. Rowan's account with the Mississippi Mills for a time included firm transactions, so that the entries cited by counsel do not necessarily conflict with Rowan's testimony.

The item of $360 credited to Rowan for timber furnished by him off of what are known in the record as the "Deaton Lands" is correctly settled by the former decision as a correct credit, and we adhere to our former ruling on this point.

Upon examination of the Douglas note item, we find that there were two contentions in the argument of the cause —one that it was an individual matter of Rowan's, the other that Rowans should have a credit for $75 paid by him on the note. The firm took up the balance of the note, paying $1,000, proceeds of lumber sales. It is now contended that this sum should be credited on the expense account against the gross proceeds of lumber sales. We now concur in this view, and the sum will be so credited.

The petition which is submitted by counsel for Lamb in connection with the suggestion of error, asks that this court, instead of rendering a final decree in the cause, as directed in the opinon of the court, will remand the cause to the chancery court with leave to Lamb to take further proof on the ground of newly discovered testimony. The petition asks, in the alternative, that this court, in entering a final decree here, will do so without prejudice to Lamb's right to file a bill of review in the chancery court on the ground of newly discovered evidence. In the case of *Hall* v. *Waddill*, 78 Miss., 16, 27 South., 936, 28 South., 831, the decree of the chancery court of Sharkey county was affirmed, and this court held in that case that such affirmance did not affect the right of the appellant to apply to the chancery court for leave to file a bill of review for such purpose. In the case now before the court the decree of the chancery court is reversed, and, as the substantial statement of the newly discovered evidence accompanies the application to this court, it

is proper for us to decide whether the decree directed to be rendered here shall be a final adjudication of their protracted controversy.  The newly discovered testimony consists of a statement of Mr. Ben King, of Beauregard, to the effect that in a conversation with Rowan a short time before the present suit was brought, Rowan said that there was no partnership between himself and Lamb, but only a common interest in the timber cut.  This remark of Rowan's was also heard by Mr. King's son, who was then about nine years old.  Mr. King states in a letter recently written to Lamb's counsel that Rowan said in a conversation with him in 1884 or 1885 that he was not a partner of Lamb's.  And about the same time Lamb told him the same thing.  Rowan also said that, if they did not go into partnership, they could be of assistance to each other.  This testimony is merely cumulative.  The evidence in respect to the issue as the partnership is voluminous and exhaustive.  A great number of witnesses were examined on this particular issue.  The undisputed facts of the case that a firm account was kept with the Mississippi Mills, that Rowan put money in the firm and took out profits from the partnership, and sometimes managed the mills, and that both Lamb and Rowan acted throughout the period from 1883 to about the year 1894 as partners, show that there was a partnership.  We completely explored the record on this issue, and, without attempting to go into the details of the testimony, we reached the conclusion that the fact that there was a partnership, as alleged in the bill, is clearly proven by the great preponderance of the testimony.  From the conduct of both Lamb and Rowan, no other conclusion can be reached. We are clearly of the opinion that the admission of the newly discovered evidence as to this casual conversation would not affect the decison of this issue.  This application therefore is denied, and the final decree will be entered as directed in the opinion of the court.  With the modification made in regard to the Douglas note item of $1,000, this sum will be allowed as a

credit on the expense account against the gross amount of the sales of lumber.

The appellant, by his counsel, has filed a suggestion of error asking the court to correct its former opinion in respect to the costs of the appeal and cross-appeal in this court, and, instead of taxing two-thirds of the costs against the appellant and one-third against the cross-appellant, to divide the cash equally between the two partners. In the former decision of the question of costs the court considered carefully this matter, and was of the opinion that the costs should be divided, as was then directed, and we see no reason for changing this direction. The costs of these appeals are very large, as the transcript of the record consists of seventeen typewritten volumes, and in view of this consideration we gave this question careful attention. The appellant denied the partnership between himself and Rowan, and upon this issue voluminous testimony was taken. That issue was found against the appellant, and the finding of the chancellor on this issue has been affirmed by this court. Again, a great mass of testimony appears in this record on hundreds of controverted items in the accounts of the partnership, and in the individual accounts of the partners with the firm. The necessity for the testimony was caused by the unsatisfactory state of the firm books of account which were kept by the appellant's bookkeeper, there being an agreement between the partners that the appellant should manage the business and keep a correct set of books. In view of these considerations, among others, we adhere to our own former ruling in respect to the adjustment of the costs of the appeal.

It is insisted for Rowan in a suggestion of error that interest should be allowed to Rowan on the decree in his favor against Lamb rendered by the chancery court and corrected by this court on a former suggestion of error submitted by the appellant. The general rule, sustained by all of the authorities that have been cited by counsel and by many others which we have

consulted, is that ordinarily interest is not allowed on a part-
nership accounting. To this there are some exceptions, where,
in the discretion of the court, interest may be allowed. We
have carefully examined the cases cited by Mr. Miller on this
subject. In *Gyger's Appeal,* 62 Pa., 73, 79, 1 Am. Rep., 382,
Judge Sharswood, after a review of authorities, states the rule
to be that interest is not ordinarily allowed in partnership ac-
countings, though there are exceptions to the rule, depending
largely on the circumstances of each individual case. "No un-
bending rule can be laid down," said the learned judge, "which
would not in particular instances work great injustice." In
the case cited interest was allowed the liquidating partner for
loans made to him during the liquidaton of the partnership,
which were a great benefit to the partnership. In *Bowling's
Heirs v. Dobyns' Administrator,* 5 Dana, 434, the venture for
which the partnership was formed had ended, and a consider-
able balance was held by the defendant, one of the partners,
until suit was brought, and he made no denial of it, aware that
he owed this exact balance. The general principle was stated,
and its exceptions, and the court allowed interest, because
the exact balance due was not denied, and had been knowingly
withheld. The court regarded this as a proper case for the
application of an exception to the general rule. *Taylor v.
Young's Administrators,* 2 Bush, 428, was similar in its facts
to *Bowling's Heirs* v. *Dobyns' Administrator,* and the rule in
that case was followed and applied. In *Stoughton* v. *Lynch,* 2
Johns, ch. 209, compound interest was allowed by the master on
partnership funds drawn out by one of the partners and used
for his private purposes. The court on appeal held that only
simple interest should be charged. We infer from the opinion
of the court that the only question in the case on the appeal was
whether simple or compound interest should be charged. The
court said that the time for interest to be charged was after the
dissolution of the firm, and when a balance had been found on

an accounting.    In *Mumford* v. *Murray,* 6 Johns. Ch., 4, the
defendant was a partner, and had received large sums of money
as a trustee under an assignment made to himself and one John
Innis Clarke, to secure the firm of Mumford & Murray, of
which firm he was a partner, and other creditors of the assign-
ors. . He denied having received these funds, and said that his
co-trustee had received them.    He used these trust funds as his
own.    He was treated by the court as a defaulting trustee, and
charged interest on the trust funds.    We think all of these
cases are correctly decided, but they do not furnish any author-
ity for the allowance of interest in the case here under consid-
eration.    It was exceedingly doubtful, when the proceedings
for an accounting was begun, what was the state of the account
between the partners.    And after the evidence was all in, and
the reference had been made to the master, it was then a most
intricate and difficult matter to state with accuracy a correct
account of the partnership matters.    We are of the opinion that
no interest should be allowed at any time during the period of
this accounting.    There is no point during this whole period
that can be fixed equitably as the time when interest should be
charged.    The accounting in the chancery court shifted from
one set of balances to another.    The first report of the master
was set aside by the chancellor.    The second report of the
master was materially modified by the chancellor on both sides
of the accounts.    And, finally, the balances found by the chan-
cellor in the decree appealed from have been changed by this
court, and different balances directed to be struck, which has not
yet been done.    During this whole period of time the accounting
has been in progress.    The accounts in the case show that the
total sales of lumber amounted to over $180,000 during the
existence of the partnership.    And the accounts of each partner
with the firm were in many instances complicated and obscure,
and so many items were controverted it was impossible to state
the accounts with exactness.

We will notice other leading authorities on this subject. Judge Story said that interest is not allowable in partnership accountings until a balance has been struck on a settlement between the partners. *Dexter* v. *Arnold,* 3 Mason, 284, Fed. Cas. No. 3855. Vice Chancellor Sandford, of New York, in *Beacham's Assignees* v. *Eckford's Ex'rs,* 2 Sandf. Ch., 116, after review of all the authorities, came to the conclusion that there is no general rule established, but that the allowance or refusal of interest depends upon the circumstances of each particular case. Judge Sharswood, in *Gyger's Appeal,* 62 Pa., 79, 1 Am. Rep., 382, approved this rule, saying: "This seems much the safest principle to adopt in view of the confidential relation of the parties and the variety and complication of such accounts." Lindley says that the general rule is that interest is not allowed in partnership accountings. Lindley on Partn. (4th ed.), 786. It is said in various cases that there is no fixed rule on the subject as to what circumstances may call for the allowance of interest. And it may be said that Judge Sharswood stated the rule correctly to be that each depends upon its own peculiar facts and circumstances. This was held in *Buckinham* v. *Ludlum,* 29 N. J. Eq., 350; *Johnson* v. *Hartshorne,* 52 N. Y., 173; *Gyger's Appeal,* 62 Pa., 73. The following cases also hold this doctrine: *Moss* v. *McCall,* 75 Ill., 190; *Tirrell* v. *Jones,* 30 Cal., 665; *Whitcomb* v. *Converse,* 119 Mass., 38, 20 Am. Rep., 311; *Tutt* v. *Land,* 50 Ga., 339. It has also been held that a partner is not entitled to interest on money advanced to or deposited with the firm for its use, unless there be a special agreement to that effect. *Lee* v. *Lashbrooke,* 8 Dana, 214; *Day* v. *Lockwood,* 24 Conn., 185; *Dosha* v. *Smith,* 20 Ala., 747. We announce as our conclusion on this subject that the general doctrine is well settled that interest in an accounting between partners is not allowed. The exception is that a court of equity may allow interest where, in view of the particular facts of a case, it is just and equitable to make the

---

---

allowance.    All of the cases that we have examined hold in the broadest terms that in the exceptional cases the allowance or disallowance of interest in an accounting between partners is within the discretion of the court.    Exercising this discretion according to our views and convictions of the circumstances of this particular case, we adhere to our former ruling on this question.

It is also suggested by counsel for Rowan that he should be allowed the statutory damages on the amount found to be due him.    This cannot be allowed, as the decree rendered for Rowan in the chancery court has been reversed on Lamb's appeal.

*The suggestion of error for Rowan and the suggestion of error for the appellant are overruled.*

*Green & Green* and *Edward Mayes,* for appellant, after the delivery of the foregoing opinions, made a motion to correct the decree.

*R. N. Miller,* for appellee, opposed the motion.

The following opinion was delivered on the motion:

*Per Curiam.*    The motion of the appellant to correct the decree which has been entered in this court by inserting in the decree for sale the timber on what are known as the "Griffin Lands," has been carefully considered.    The question presented is whether the timber on these lands, described in the motion, are partnership property or the private property of E. A. Rowan. We have examined the proof on the question, and find that the evidence is conflicting on this issue; but the title was taken in the name of Rowan, and he testified that the land and timber were bought by him and were paid for with his private funds. In view of the fact that the firm bought a large quantity of land as partnership property, taking the title in the partners, and that Lamb purchased property during the partnership for him-

self, paying for it with his own funds, and that Rowan did the same for himself, the consideration that the title to the Griffin lands was taken in Rowan, together with the manner in which the partners made their land purchases, as stated, should be controlling in view of the conflict in the testimony as to the funds supplied in the purchase of the timber in controversy.

*The motion is overruled.*